UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

| | |
|---|---|
| GIAN GORDON-WHYTE, CPA, LLC, <br> a Florida Limited Liability Company | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| vs. | ) <br> ) |
| DELERME CPA, LLC, a Georgia Limited <br> Liability Company, and VICTOR DELERME, <br> an individual and Georgia resident | ) <br> ) <br> ) <br> ) |
| Defendants. | ) |
| _____/ | |

## COMPLAINT

Plaintiff, GIAN GORDON-WHYTE, CPA, LLC. (sometimes referred to herein as "Purchaser") sues Defendant DELERME CPA, LLC (sometimes referred to herein singularly as "Seller") and Defendant VICTOR DELERME ("Victor Delerme") and Seller and Victor Delerme are referred to collectively as "Sellers", as follows:

1.      Purchaser is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

2.      Seller is a Georgia Limited Liability Company, which submitted itself to the jurisdiction and venue of this court in a written agreement, which is the subject of this action.

3.      Defendant Victor Delerme is the sole owner of Seller and is an individual residing in the state of Georgia, who submitted himself to the jurisdiction and venue of this court in a written agreement, which is the subject of this action.

4.      This Court has jurisdiction over the parties as the cause of action arose from an agreement and business transaction requiring performance in Miami-Dade County, Florida and

because the parties expressly submitted themselves to the jurisdiction of the Courts of Miami-Dade County, Florida   (s*ee*, Paragraph 11.8 of that certain Purchase Agreement among the parties effective January 21, 2022, a true and correct copy of which is attached as <u>Exhibit A</u>). Furthermore, the subject Purchase Agreement required performance in Miami-Dade County Florida.

5.      The agreement, pursuant to which this action is brought, specifies that "Venue shall lie in Miami-Dade County, Florida." (Paragraph 11.8 of <u>Exhibit A</u>). Valid forum selection clauses are to be enforced. *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013).

6.      The sum in dispute exceeds $75,000 exclusive of interests and costs, and the action is between citizens of different states. *See* 28 U.S.C. §1332.

INTRODUCTION

7.      This is an action for and breach of contract, fraud in the inducement, rescission, negligence and unjust enrichment.

8.      The controversy arises from a business transaction entered into on January 21, 2022 between two (2) tax preparation firms, whereby Purchaser, agreed to pay Seller $150,000 in exchange for (a) Purchaser acquiring a portion of Seller's business, and specifically, 107 tax preparation client files (the "<u>Book of Business</u>" or "<u>Client Files</u>") and (b) Seller "*referring*" the clients that were the subject of the Book of Business to Purchaser (the "<u>Transaction</u>").

9.      Pursuant to the Transaction, Purchaser would acquire the Book of Business and Seller would refer the clients to Purchaser would then begin servicing the subject clients starting

2

with the *2021 tax season* (commencing January 24, 2022) [1] and, Purchaser would generate revenue from servicing such clients.

10.     Before the Transaction was consummated, Purchaser requested (as part of Purchaser's due diligence) a review of certain representative client files that comprised the Book of Business and Seller selected and provided to Purchaser, six files. Purchaser reviewed the six files and detected no irregularities or red flags.

11.     However, following the closing of the Transaction, and upon the delivery of the remaining 101 Client Files, Purchaser contended that Seller had been filing fraudulent tax returns relative to the Client Files and that Seller had blatantly disregarded applicable laws and ethical requirements in Seller tax preparation practices.

12.     Purchaser asserts that Seller defrauded Purchaser and breached the Agreement, and Purchaser now seeks relief, including a rescission of the Agreement.

---

[1] The 2021 *"tax season"* is the period commencing January 24, 2022 and continuing through April 18, 2022.  The 2021 *"tax season"* and refers to the period when the Internal Revenue Service begins accepting and processing 2021 tax returns. *See* January 10, 2022 Press Release from IRS. *"2022 tax filing season begins Jan. 24 IRS outlines refund timing and what to expect in advance of April 18 tax deadline." www.irs.gov* (visited March 30, 2022).

FACTUAL  ALLEGATIONS

13.      Purchaser is a tax planning and preparation firm based in Miami-Dade County, Florida.

14.      Purchaser is owned and operated by Gian Gordon-Whyte, an individual and Florida resident.

15.      Gian Gordon-Whyte is a Certified Public Accountant with a Master's degree in Accounting.

16.      Gian Gordon-Whyte is also a former Internal Revenue Service Agent and is accredited by the Association of Certified Fraud Examiners[2] as a Certified Fraud Examiner.

17.      Seller is in the business of providing to the public professional services relating to tax planning, income tax preparation, international tax services, Puerto Rico Tax incentives and cryptocurrency tax services.

18.      The sole owner of Seller is Defendant Victor Delerme, an individual and Georgia resident.

19.      Defendant Victor Delerme is a tax return preparer under 26 USC § 7701(a)(36).[3]

---

[2] The Association of Certified Fraud Examiners is the largest anti-fraud organization. Earning the *Certified Fraud Examiner (ACFE)* designation requires satisfying educational requirements, professional experience and requires applicants to be of good moral character, to submit letters of recommendation and to sit for an exam.  ACFE is known as the premier provider of anti-fraud training and education and has a mission of reducing incidents of fraud and white-collar crime. *See*, *www.acfe.com* (visited March 30, 2022).

[3] The term "tax return preparer" means any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by this title or any claim for refund of tax imposed by this title. For purposes of the preceding sentence, the preparation of a substantial portion of a return or claim for refund shall be treated as if it were the preparation of such return or claim for refund. 26 USC § 7701(a)(36).

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544  |  Fax. 305 356 5720 |  www.Lehtinen-Schultz.com

20.     Defendant Victor Delerme is also a Certified Public Accountant licensed to practice public accounting in the state of Georgia (since 2009) and in the Commonwealth of Puerto Rico and as a Certified Public Accountant, Defendant Victor Delerme is licensed by such jurisdictions to  practice public accounting and Defendant Victor Delerme has satisfied (and continues to maintain) professional experience and good character requirements as established by various boards of accountancy.

21.     Defendant Victor Delerme is currently, and at all relevant times has been been, bound by the code of professional ethics as promulgated by The Georgia Society of Certified Public Accountants, as well as, by the Departmento de Estado de Puerto Rico, Board of Examiners of Certified Public Accountants and by federal, state and local taxing authorities.

22.     Defendant Victor Delerme holds a Bachelor's degree in Accounting from Universidad de Puerto Rico.  Prior to launching Delerme LLC in 2009, Defendant Victor Delerme worked at KPMG as a Senior Accountant during the period of 2004 through 2007 and also worked as a Tax Accountant at Habif, Arogeti & Wynne, LLP an independent certified public accounting and business advisory firm.

23.     Defendant Victor Delerme is an experienced tax preparer and has completed ethical requirements and specified levels of continuing education to maintain his active status as a CPA.

24.     Defendant Victor Delerme is familiar with the Internal Revenue laws and regulations.

25.     Prior to the closing of the Transaction, Purchaser requested a review of representative Client Files and Seller selected and presented to Purchaser, six illustrative Client Files.

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544  |  Fax. 305 356 5720  |  www.Lehtinen-Schultz.com

26.     Purchaser also reviewed public records in Fulton County, as well as records relating to potential disciplinary actions against or involving Sellers by the Georgia Board of Accountancy prior to consummating the Transaction, and such research and search results did not reveal any prior or potential misconduct by either Seller or Defendant Victor Delerme.

27.     On or about January 21, 2022, the parties entered into that certain Purchase Agreement hereinafter the "Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

28.     Under the Agreement, Purchaser agreed to acquire from Seller 107 client or taxpayer files (hereinafter "Clients" or "Client File(s)") in exchange for the sum of $150,000 (the "Purchase Price").

29.     The Purchase Price was calculated and based upon a factor of $1,206.42 per each Client File, and the Purchase Price was to be remitted to Seller in 2 parts.

30.     The first portion of the Purchase Price, or 75% ($112,500), was remitted on January 21 2022 to Seller upon the execution and delivery of the Agreement, and the second portion of the Purchase Price, or 25% ($37,500), was to be remitted to Seller by April 30, 2022. *See* Paragraphs 4.1.1 and 4.1.2 of the Agreement.

31.     On January 24, 2022, Seller received the first 75% of the Purchase Price ($112,500).

32.     Pursuant to the parties' Agreement, upon receipt of the initial Purchase Price, Seller and/or Victor Delerme was required to do the following,:

   (a)     transfer the 107 Client Files to Purchaser;

   (b)     "*refer*" Gian Gordon-Whyte (by January 31, 2022) to the Clients;

6

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

(c)     disseminate, to the Clients, an email announcement from Seller pronouncing Gian Gordon-Whyte's new affiliation with Seller's accounting practice;

(d)     incorporate and publish the professional profile of Gian Gordon-Whyte onto Seller's official website;

(e)     grant Purchaser access to Seller's tax preparation software so that Purchaser could access historical data relating to Client Files;

(f)     consult and coordinate with Gian Gordon-Whyte to assist with the Client transition as contemplated and required by the Agreement;

(g)     establish an email account for use by Gian Gordon-Whyte when interacting with the Clients; and

(h)     provide all post-closing deliverables as set forth on Schedule C of the Agreement.

33.     On January 24, 2022 (at 6:49 p.m.), Purchaser advised Seller that (a) the official *referral* process had not yet begun and reminded Seller that such process was supposed to commence on January 24, 2022; (b) Purchaser's email account had not been set up and that email and other login credentials has not been granted to Purchaser as required; and (c) the email announcement publicizing Ms. Gordon-Whyte's new affiliation with Seller had not yet been disseminated.

34.     Seller did not receive a response to the foregoing so, on January 25, 2022, Purchaser again followed-up.

35.     On January 26, 2022, Purchaser provided to Seller a curriculum vitae and photograph of Gian Gordon-Whyte so that Seller could add the same to Seller's website as required by the Agreement.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

36.     On January 26, 2022, Seller delivered *a list* of 104 Client Files instead of the 107 Client Files as required under the Agreement, and the list included three files that were duplicates.[4]

37.     On January 27 and January 28, 2022, Purchaser again followed-up with Seller on the status of Seller setting up Purchaser's email account and the need to see a draft email announcement (publicizing Ms. Gordon-Whyte's new affiliation with Seller) and Purchaser also advised Seller that the failure by Seller to set up Purchaser email account and to add Gian Gordon-Whyte's profile to Seller's website was a "*material*" issue.

38.     On January 29, 2022, Seller set up Purchaser's email account, but still did not issue the client announcements.

39.     On February 4, 2022, Seller gave Purchaser access to Seller's software.

40.     After still not receiving any Client *referrals* as required by the Agreement and with the Seller still failing to upload Purchaser's profile onto Seller's official website, Purchaser on February 11, 2022, again notified Seller via email that Seller was in default of certain material contractual obligations.

41.     On February 14, 2022, Purchaser's Counsel issued a formal notice of default to Sellers, *see* Exhibit B.

42.     On February 15, 2022 – over 3 weeks after the closing of the Transaction and two weeks after the official opening of 2021 *tax season*, Seller finally started to transfer Client referrals to Purchaser.

43.     The manner in which the Client Files were to be transferred included Seller affirmatively "*referring*" Purchaser.

---

[4] The three (3) duplicated files were (a) Files No. 31 and 73, (b) File No. 15 and 89; and (c) Files No. 4 and 75.

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

44.     The "*referral*" component of the Transaction was a key part of the Transaction and was one of the hallmarks of the deal and, the parties took great care to spell out what Client "*referrals*" needed to include, to wit:

> 2.30      "Refer" or "Referring" collectively means the act(s) or actions by Seller, Principal and/or by their Representatives of (i) ***formally and professionally presenting either Purchaser or Gordon-Whyte (as context requires) to those certain Clients and New Clients with the specific intention of endorsing the professional capabilities of Purchaser and/or Gordon-Whyte and inducing, persuading and/or encouraging such Clients or New Client to use (and to continue using) the professional tax services of Purchaser or Gordon-Whyte*** (as context requires) and (ii) ***working cooperatively with Purchaser, Gordon-Whyte and their respective Representatives and to enhance the online professional brand, standing and profile(s) of Gordon-Whyte and Purchaser*** in the "Form 1040" market in which Seller currently operates.

(Emphasis added), *see* ¶ 2.30 of the Agreement.

45.     Despite the fact that referrals had to be undertaken in a specific manner, Seller only sent rudimentary information concerning referred clients to Purchaser.  Below is sample of how Purchaser was "referred":



Further examples of inadequate file referrals are attached hereto as Composite **Exhibit C**.

46.     Sellers breached material obligations of the Agreement.

47.     On February 17, 2022, Seller's Counsel responded to the February 14, Notice of Default and Seller denied that any default had occurred, *see* Exhibit D.

48.     Sellers did not abide by their respective obligations to ensure transition of the files and integration of the Clients into Gordon-Whyte's practice.  Specifically,

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

(a)     Sellers failed to make the necessary "*referrals*" as required by, and in accordance with,  Section 3.1 and 3.2 of the Agreement;

(b)     Seller did not timely create an official email account for use by Purchaser as required by Section 3.1(i) of the Agreement;

(c)      Sellers did not disseminate an email announcement to any of the Clients announcing Gordon-Whyte's new affiliation with Seller, as required by section 3.1(ii) of the Agreement;

(d)     Seller did not update its official website (*delermecpa.com*) to include the professional profile of Gian Gordon-Whyte as a tax professional as required by Section 3.1(iii) of the Agreement;

(e)     Seller never "*referred*"[5] any Clients to Purchaser as required by the Agreement.

(f)     Defendant Victor Delerme never "*referred*"[6] any Clients to Purchaser as required by the Agreement and Defendant Victor Delerme also never consulted with Purchaser to facilitate Purchaser's onboarding or Purchaser's referral to Clients  after closing;

---

[5] Seller never "… formally and professionally present[ed] either Purchaser or Gordon-Whyte [to Clients]… with the specific intention of endorsing the professional capabilities of Purchaser and/or Gordon-Whyte…," and Seller never induc[ed], persuad[ed] and/or encourage[ed] such Clients … to use (and to continue using) the professional tax services of Purchaser or Gordon-Whyte" nor did Seller [work] cooperatively with Purchaser, Gordon-Whyte and …. to enhance the online professional brand, standing and profile(s) of Gordon-Whyte and Purchaser…" See ¶2.3 for definition of "*referral*" under the Agreement.

[6] Seller never "… formally and professionally present[ed] either Purchaser or Gordon-Whyte [to Clients]… with the specific intention of endorsing the professional capabilities of Purchaser and/or Gordon-Whyte…," and Seller never induc[ed], persuad[ed] and/or encourage[ed] such Clients … to use (and to continue using) the professional tax services of Purchaser or Gordon-Whyte" nor did Seller [work] cooperatively with Purchaser, Gordon-Whyte and …. to enhance the

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

(g)     Seller failed to provide the post-closing deliverables as set forth on Schedule C of the Agreement; and

(h)     most notably, the lion's share of the Client Files eventually transferred to Purchaser were the product of proscribed conduct prohibited by 26 U.S.C §§ 6694(a)[7] and 6695.[8]

49.     Sellers had prepared tax returns that (i) willfully and/or improperly attempted to understate the liability of the subject taxpayer; (ii) recklessly and/or negligently disregarded the IRS rules or regulations; and/or (iii) outright falsified amounts on tax returns.  The misconduct of Sellers had been undertaken on a recurring basis and established a pattern of gross negligence or recklessness on the part of the Sellers.

50.     Sellers engaged in practices such as falsifying deductions on Form 1040 Schedule C by fabricating businesses, by reporting losses from such false businesses and by claiming personal expenses as unreimbursed business expenses.

51.     Sellers also combined Schedule C losses with false deductions listed on the taxpayers' Schedule A in order to fraudulently lower the taxpayer's taxable income.

---

online professional brand, standing and profile(s) of Gordon-Whyte and Purchaser…"  See ¶2.3 for definition of "*referral*" under the Agreement.

[7] If a tax return preparer (a) prepares any return or claim of refund with respect to which any part of an understatement of liability is due to an unsubstantiated position and knew (or reasonably should have known) of the unsubstantiated position, such tax return preparer shall pay a penalty with respect to each such return or claim in an amount equal to the greater of $1,000 or 50 percent of the income derived (or to be derived) by the tax return preparer with respect to the return or claim. 26 U.S.C § 6694(a).

[8] Any tax return preparer with respect to any return or claim for refund who fails to comply with due diligence requirements imposed by the Secretary by regulations with respect to determining (1) eligibility to file as a head of household on the return, or (2) eligibility for, or the amount of, the credit allowable shall pay a penalty of $500 for each such failure. 26 U.S.C § 6695(g).

11

52.     The relevant Client Files were devoid of due diligence or documentation supporting the positions taken and the facts are clear that Sellers failed to make any reasonable inquiry into the taxpayer's entitlement to the tax refunds being obtained.

53.     The referenced irregularities establish that Sellers had failed to comply with all applicable laws including 26 U.S.C § 6694(a) and 26 U.S.C § 6695(a).

54.     After carefully evaluating the circumstances that had unfolded and considering all available options, Purchaser took steps to rescind the Transaction on grounds that proceeding would require her to violate 26 CFR § 1.6694-3[9] and because Seller refused to recognize or take responsibility for Seller's potential culpability.  More importantly, Seller refused to offer any assurance to Purchaser that the misconduct would not persist.

---

[9] 26 CFR § 1.6694-3 provides, in relevant part that, a tax return preparer is liable for a penalty under section 6694(b) equal to the greater of $5,000 or 50 percent of the income derived (or to be derived) by the tax return preparer if any part of an understatement of liability for a return or claim for refund that is prepared is due to (i) a willful attempt by a tax return preparer to understate in any manner the liability for tax on the return or claim for refund; or (ii) any reckless or intentional disregard of rules or regulations by a tax return preparer. *See*, 26 CFR § 1.6694-3(a).  A preparer is considered to have willfully attempted to understate liability if the preparer disregards, in an attempt wrongfully to reduce the tax liability of the taxpayer, information furnished by the taxpayer or other persons. For example, if a preparer disregards information concerning certain items of taxable income furnished by the taxpayer or other persons, the preparer is subject to the penalty. *See*, 26 CFR § 1.6694-3(a).  Also, a tax preparer is considered to have recklessly or intentionally disregarded a rule or regulation if the preparer takes a position on the return or claim for refund that is contrary to a rule or regulation and the preparer knows of, or is reckless in not knowing of, the rule or regulation in question. A preparer is reckless in not knowing of a rule or regulation if the preparer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable preparer would observe in the situation. *See,* 26 CFR § 1.6694-3(a).

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

55.     Purchaser also feared that, if Purchaser proceeded to service the Client Files, Purchaser would run the risk of (a) assisting or becoming complicit with the misconduct of the Sellers, (b) violating 26 U.S.C § 6694(a) and 26 U.S.C § 6695(a); and (c) sullying its professional reputation because that the Client Files were knowingly fraudulent.

56.     On February 14, 2022, Purchaser demanded that the Transaction be voluntarily rescinded and provided Seller with a detailed analysis of the 76 files that contained the irregularities.

57.      Seller, by and through its legal counsel, outright rejected Gordon-Whyte's assertions and blamed rogue and lazy tax preparers for any improper returns.   Seller refused to recognize or take responsibility for Seller's potential culpability and more importantly, Seller refused to offer any assurance to Purchaser that the misconduct would not persist.

58.     Purchaser has complied with all conditions precedent to bringing this lawsuit.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

COUNT I – Breach of Contract
(Delerme CPA LLC and Victor Delerme)

59.     Purchaser realleges and reavers their allegations in paragraphs 1 through 58, as though fully set forth herein.

60.     Purchaser and Sellers had a valid and enforceable Agreement. *See* **Exhibit A**.

61.     Purchaser paid valuable consideration and performed its obligations under the Agreement.

62.     Seller breached the Agreement in numerous ways, including without limitation by:

(a)     failing to make the necessary "*referrals*" as required by, and in accordance with,  Section 3.1 and 3.2 of the Agreement;

(b)     not timely creating an official email account for use by Purchaser as required by Section 3.1(i) of the Agreement;

(c)     not disseminating  an email announcement to any of the  Clients announcing Gian Gordon-Whyte's new affiliation with Seller, as required by section 3.1(ii) of the Agreement;

(d)     not updating the official website (*delermecpa.com*) of Defendant Victor Delerme CPA LLC to include a professional profile of Gian Gordon-Whyte as a tax professional as required by Section 3.1(iii) of the Agreement;

(e)     not consulting with Purchaser to facilitate Purchaser's onboarding or Purchaser's referral to Clients after closing;

(f)      not complying with applicable laws in the preparation of the Client Files and by violating I.R. C. § 7407(b)(1) and 26 U.S.C §§ 6694 and 6695;

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

(g)      not providing all of the "*Seller Post Closing Deliverables*" as required by Paragraph 6.2(i) of the Agreement and as enumerated on Schedule C of the Agreement, including, to wit:

      i.      Full Client information which listing was to include, at a minimum Client Name, Client address, telephone numbers and Client email addresses;

      ii.      Federal Tax Form(s) filed;

      iii.      State and Local Tax Form(s) filed;

      iv.      Client Software Data Files for each Client being "*Referred*" and all CCH Software Files;

      v.      Client document requests;

      vi.      work papers;

      vii.      last 3 years of tax returns;

      viii.      Client notes;

      ix.      Client passwords and other credentials or files (QB & Tax Return Files);

      x.      Copy of Seller's current engagement letter;

      xi.      Copies of all current Client Agreements relating to professional services being transferred (written Client agreements and/or if Client agreements or arrangement are unwritten, descriptions of such arrangements or agreements);

      xii.      Sample of Client Communication, including communication

15

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

relating to document request(s) email, opening of tax season email, completing of tax return email, soliciting payment emails; and all and all other routine or customary Client communication.

*See* Schedule C of Agreement.

63.     Purchaser has been damaged as a result of the Seller's breach of the Agreement, as follows:

(a)     the Book of Business is irreparably tainted and the Client Files that were the subject of the Transaction are not viable for future business;

(b)     Seller's proscribed conduct and the proscribed conduct of Defendant Victor Delerme has frustrates Purchaser's ability to ethically and lawfully develop and sustain future Client relations;

(c)     Seller's and Defendant Victor Delerme's  proscribed conduct threatens the reputation of Purchaser;

(d)     Client Files were overvalued as Clients will undoubtedly now receive far lower refunds in the future (if any), and thus, will result in Purchaser not being able to retain the subject Client(s) and the projected revenue and profits;

(e)     to the extent that Purchaser is required to service the subject Clients, Purchaser would be required to notify Client of Sellers' misconduct and of the impact of such misconduct of the Clients' future refunds including the need to potentially amend past returns and such Client's exposure to back taxes, penalties and interest, as well as, criminal liability; and

(f)     missing the 2021 tax season and the ability to generate the revenue projected of $124,335 in 2022.

WHEREFORE, Purchaser demands judgment against Seller and Victor Delerme for all damages Purchaser sustained as a result of Seller's breach of the Agreement contract, including,

16

without limitation, lost profits, pre-judgment interest, and costs and such other and further relief as is necessary and proper.

COUNT II - Fraud in the Inducement
(Delerme CPA LLC and Victor Delerme)

64.     Purchaser realleges and reavers her allegations in paragraphs 1 through 58, as though fully set forth herein.

65.     Prior to consummating the Transaction, Purchaser requested, as part of its due diligence, a sampling of the Client Files to be acquired and Seller hand-selected and presented to Purchaser, six (6) Client Giles, which purportedly represented files that comprised and represented the Book of Business being acquired (the "Due Diligence Files").   Such Due Diligence Files reflected a mix of individual and business returns for which Seller had charged professional fees ranging between $600 and $3000.

66.     The Due Diligence Files, when compared to the Client Files that were provided to Purchaser _after_ the closing of the Transaction, were markedly different (better).   For example, the Due Diligence Files were generally chock-full of supporting information such as historical tax returns, completely filled-out Forms 8867 (Paid Preparer's Due Diligence Checklists), client worksheets, excel sheets showing client receipts, client deposits, invoices, client communications, client explanations, receipts, bank statements, tuition statements and other backup.   In some cases, the Due Diligence Files contained as many as 16 separate back-up files.   And, although the Due Diligence Files contained larger deductions than permitted, they seemed to be well-supported when looking at the files _in toto_.

67.     By way of example, Taxpayer File No. 70, contained 16 separate backup files and in this case, the taxpayer _had_ actual Schedule C reportable income (not just losses or deductions)

and the entries appeared to correspond to, and be supported by, the backup information provided by the taxpayer and, the income was not reported in *round numbers* (*e.g.,* $53,034).

68.     Similarly, Taxpayer File No. 74, contained 14 separate backup files that included a plethora of backup such as tuition statements, IRS communications, invoices, excel spreadsheets itemizing purchases for business supplies, bank fees, professional fees, travel, office supplies, tuition statements, shipping costs, W-2's and Form 1098 and 1099's which was a notable distinction from the post-closing Client Files.

69.     Taxpayer File No. 42 had actual Schedule C income for 2020 which was a notable distinction from the post-closing Client Files.

70.     Taxpayer File No. 50 had large Schedule E deductions, however, this was different from the post-closing Client Files in that the deductions in the Due Diligence Files related to 3 separate real estate property and each property addresses was separately listed on the return with varying expenses for each, *e.g.*, $12,174, $13,908 and $15,172.

71.     Even though Taxpayer No. 21 file contained a large Schedule C loss ($36,600) the loss matched the worksheet provided by the client plus the taxpayer had reported income of $110,849. Again, a notable distinction from the post-closing Client Files.

72.     Overall, the Due Diligence Files were seemingly complete and contained business deduction worksheets that conformed to the reported Schedule C business deductions and such deductions appeared to be ordinary and necessary given the taxpayer's industry and when taking into account, other relevant factors.

73.     Following the closing of the Transaction and after receiving and reviewing the remainder of the Client files, it became clear to Purchaser that Sellers had been systematically fabricating and/or inflating expenses and deductions of taxpayers on Schedules C and E in order

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

to reduce taxpayer liabilities.  The effect of these false entries was to negate the taxpayer's taxable income, which, when combined with the taxpayer's withholdings, generated a false refund payment by the IRS.

74. Purchaser was unaware of Seller's misconduct prior to the closing of the Transaction.

75. Prior to, and upon the Effective Date of the Agreement, Sellers falsely represented a material fact to Purchaser, that the Sellers had operated their tax preparation business ethically and in compliance with all applicable laws.

76. For each improper file provided to Purchaser, Sellers made a deliberate and knowing misrepresentation that the file was viable and that past returns had been prepared in accordance with applicable law, when that was in fact not true.  Sellers knew that the past tax returns in the Client Files that were the subject of the Transaction were not prepared in accordance with ethical requirements and/or in accordance with applicable laws.

77. Sellers' respective misrepresentations that the Client Files were prepared by Sellers in accordance with applicable laws and ethical requirements were intended to induce Purchaser to rely on the representations to acquire the Client Files and to otherwise consummate the Transaction based on a per-file value of $1,206.42.

78. But for such representations, including the CPA status of Defendant, Victor Delerme, Purchaser would not have proceeded with the Transaction and have paid the full purchase price of $112,500 for 107 separate files.

79. Purchaser was damaged by its reliance on Sellers' misrepresentations, which includes proceeding to pay $1,206.42 per file.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

*Defendants' Schedule E Tax Scheme*

80.     Schedule E (Form 1040) is used to report income (or losses) from rental real estate, royalties, partnerships, S corporations, estates, trusts, from other real estate mortgage investment conduits.  Taxpayers are permitted to deduct ordinary and necessary expenses.  Schedule E filings are required to include property addresses, a description of the type of real property and the details of the income and expenses being reported.  Schedule E deductions must be ordinary and necessary and must relate to the production or collection or income and/or for the management, conservation, or maintenance of property held for the production of income. Common Schedule E expenses include advertising, cleaning and maintenance; depreciation; homeowner association dues and condo fees; insurance premiums; interest expenses; local property taxes; management fees; pest control; equipment rentals; rents paid to others; repairs; building supplies; trash removal fees; travel expenses; utilities and yard maintenance.

81.     Sellers improperly reduced the federal income tax liabilities on behalf of the taxpayers Clients by fabricating and/or by inflating expenses and deductions of taxpayers on Schedules C and E.  This is supported by the fact that almost all of the Schedule E deductions were invariably "losses" (rarely was any income reported).  For example, in almost all cases, the subject files reflected (i) the absence of corresponding rental income in light of the purported business or real estate ventures undertaken; (ii) the fact that all of the Schedule E deductions were in the form of "*management fees*"; (iii) the purported management fee deductions were almost always either reported in "*round numbers*" or were duplicative (cut and pasted) from prior years and were not customized to reflect to potential variances in property types, uses and/or in varying management needs; (iv) the majority of the Clients took the exact same management fee deduction amount; and (v) the Client files, were, for the most part, devoid of any supporting documentation.

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  | Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 |  www.Lehtinen-Schultz.com

82.     Sellers knowingly falsified their clients' federal income tax returns in order to generate fraudulent refunds by, among other things, fabricating and falsely inflating the taxpayer's allowable expenses and deductions.  Sellers falsely and fraudulently promoted and knowingly and systematically assisted taxpayers in the wrongful preparation of Schedule E's that result in the understatement of tax liability. The effect of these false entries was to negate the taxpayer's taxable income, which, when combined with the taxpayer's withholdings, generated a false refund payment by the IRS.  This applies to File Nos. 7, 9, 11-20, 22-26, 32, 34, 36, 41, 46, 48, 52, 53, 58, 59, 74, 82, 84, 85, 87, 92, 96, 99-101 and 106.

### _Defendants' Schedule C Tax Scheme_

83.     Schedule C (Form 1040) is used to report income or (losses) from a business operated by a taxpayer or from a profession practiced as a sole proprietor and which income is subject to self-employment tax. An activity qualifies as a Schedule C business if the primary purpose for engaging in the activity is for income or profit and if the taxpayer is involved in the activity with continuity and regularity. Sporadic activities or hobbies do not qualify as a business. Schedule C's are also used to report (a) wages and expenses as employee, (b) income and deductions of certain qualified joint ventures, and (c) certain amounts shown on a Form 1099, such as Form 1099-MISC, Form 1099-NEC and Form 1099-K. Of the 104 files delivered to Plaintiff, 42, or 40.38%, contained a pattern and scheme whereby all such files contained falsely inflated expenses and deductions on Schedule C.

84.     Here, Sellers created fictitious or inflated purported expenses.  This proposition is supported by the fact that almost all of the Schedule C deductions were invariably "losses" (not income), and, such deductions were (i) comprised of "_round numbers,_" (ii) the expenses are

21

sporadic and non-recurring year-over-yea,r and there is a lack of continuity; (iii) the expenses were not generally in the same cost range as the preceding tax year; (iv) the expenses do not appear to correspond to the relevant business industry and the returns failed to reflect business industry codes; (v) the purported business failed to generate income for several years; (vi) the purported deductions taken were generally disallowed (*e.g.,* personal grooming expenses, clothing); and (vii) the Client Files were invariably devoid of any supporting documentation such as receipts, bank or credit card statements and/or worksheets.

85.     Another constant pattern of the tax returns prepared by Sellers related to the fact that the subject taxpayers were almost exclusively W2-wage earners (*e.g.,* nurses, pharmacists, flight attendants, insurance executives, IT managers, target employees, etc.), yet, these wage earners are all purportedly real estate investors sustaining business losses, year after year without ever earning any income. Here, Sellers falsely and fraudulently promoted and knowingly and systematically assisted taxpayers in the wrongful preparation of Schedule E's that result in the understatement of tax liability. These indicators are present in File Nos. 2, 7, 9, 12-26, 31, 32, 35, 37, 48, 52, 53, 56, 58-64, 68, 72, 80, 82, 84, 85, 87, 90, 92, 96, 100-102 and 106.

86.     Below are some representative Client Files that demonstrate Seller's fraudulent misconduct by fabricating expenses and deductions:

(a)     Taxpayer No. 7 specifically indicated in an email that they did not own, manage or maintain any real property as a means of generating income, yet Sellers filed a tax return in 2020 reflecting -$5,000 in real estate losses and -$12,000 in other purported business losses.

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

(b)     Taxpayer No. 9 was a W2 wage earner with annual wages totaling $46,989. However, in 2020, Sellers filed returns for Taxpayer No. 9 without any supporting documentation showing that the tax payer had sustained business losses of $40,000 (notice round numbers) to reduce their adjustable income to $6,989.   In addition, the file is entirely devoid of any documentation whatsoever to support the business losses reported.

(c)     Taxpayer No. 12 claimed Schedule C losses of _exactly_ $6,000 in 2019 and claimed Schedule E losses relating to real estate activities of _exactly_ -$5,500.  In 2020 Taxpayer No. 12 again claimed Schedule C losses of _exactly_ $6,000 in 2020 and claim Schedule E loss relating to real estate activities of _exactly_ -$5,500.  This demonstrates Seller's pattern and scheme of fabricating fictitious expenses.  Despite these purported deductions and losses, Taxpayer No. 12 reported no business or rental income for the relevant years.  This pattern of duplicating exact numbers year over year is also reflected in Client File Nos. 14, 16, 17, 24, 25, 32, 37, 46, 52, 58, and others.

(d)     Taxpayer No. 16 reported to Sellers, in a written communication, that the taxpayer had _no real estate activities_.  In fact, the taxpayer advised the Sellers that the taxpayer had sold their property. However, notwithstanding that fact, the Sellers prepared tax returns showing management fee deductions relating to real estate transactions in the sum of $12,487. Further evidence of the pattern of Sellers systematically preparing fraudulent returns is apparent in the file return of Taxpayer No. 16, who took a Schedule C deduction in the sum of _exactly_ -$16,347 in 2019 and took Schedule E loss deductions relating to real estate activities in the sum of _exactly_ -$12,487.  Seller's fraud pattern is further indicated by the fact that Taxpayer No 12

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

again took the identical deductions (cut and paste), specifically, -$16,347 in 2020 and took 2020 Schedule E loss deductions relating to real estate activities again in the sum of <u>exactly</u> -$12,487.

(e)     Taxpayer No. 18 provided the Seller with an expense worksheet that mostly included personal and non-business related expenses such as "*personal* travel to Michigan $1600" and "Repairs & Maintenance on *my* transportation to work $1000."  Both of these expenses are generally disallowed unless they are unreimbursed employee expenses, which is not the case here because the expenses are on Schedule C.  The taxpayer also included on their worksheet other disallowed expenses, all of which were nevertheless included on the Taxpayer's return and in some cases, the expenses were inflated when filed.

(f)     Sellers' unlawful practices are further demonstrated by   the   fact   that Taxpayer No. 37 took identical deductions year after year, specifically, -$8,550 in 2019 and in 2020 and while receiving no corresponding business income.

(g)     Sellers' fraud schemes are also evidenced by the fact that Taxpayer No. 46 took the identical Schedule C and Schedule E deductions, specifically, -$18,471 and -$14,587, respectively in 2019 and then in 2020, the taxpayer purportedly sustained the exact same losses (exactly -$18, 471 and -$14,587) and took the exact same deductions in both years, while receiving no business income.

(h)     Sellers' fraud scheme is indicated in by the fact that Taxpayer No. 67 sustained the exact same business loss two straight years of exactly -$8,845.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

*Defendants' Scheme of Asserting Business Ventures, Yet No Income*

87.     Despite the fact that most of the tax returns reflect significant Schedule C losses and significant management fee deductions (in some cases as much as -$25,000 in losses year over year), none of those purported businesses ever had reportable income, which is a red flag.  Below are a list of Schedule C and Schedule E deductions as reflected by the returns prepared by Sellers.  However, in all cases those taxpayer never received any income from these purported business ventures:

| | Tax Year | Schedule C Deductions | Schedule E Deductions |
|---|---|---|---|
| Client File No. 9 | 2019 | -$19,500 | -$7,500 |
| | 2020 | -$15,000 | -$25,000 |
| Client File No. 12 | 2019 | -$6,000[10] | -$5,000 |
| | 2020 | -$6,000[11] | -$5,000 |
| Client File No. 14 | 2019 | -$12,000 | -$5,000 |
| | 2020 | -$12,000 | -$5,000 |
| Client File No. 15 | 2019 | -$22,253 | -$10,253 |
| | 2020 | -$25,000 | -$12,000 |
| Client File No. 16 | 2019 | -$16,347 | -$12,487 |
| | 2020 | -$16,347 | -$12,487 |
| Client File No. 17 | 2019 | | -$14,200 |
| | 2020 | -$5,000 | -$14,200 |
| Client File No. 18 | 2020 | -$9,465 | -$12,000 |
| Client File No. 21 | 2020 | -$36,660 | |
| Client File No. 24 | 2019 | -$12,500 | -$14,100 |
| | 2020 | -$12,500 | -$14,100 |
| Client File No. 25 | 2019 | -$1,605 | -$13,500 |
| | 2020 | -$1,605 | -$13,500 |
| Client File No. 26 | 2020 | -$20,000 | -$5,500 |
| Client File No. 32 | 2019 | -$12,535 | -$12,500 |
| | 2020 | -$12,525 | -$12,500 |
| Client File No. 34 | 2019 | | -$6,500 |
| | | | -$7,500 |
| Client File No. 35 | 2020 | -$21,580 | |
| Client File No. 36 | 2019 | | -$12,500 |
| | 2020 | | -$25,000 |
| Client File No. 37 | 2019 | -$8,550 | |
| | 2020 | -$8,550 | |
| Client File No. 41 | 2019 | -$5,027 | -$6,200 |
| | 2020 | -$5,027 | -$6,200 |
| Client File No. 46 | 2019 | -$18,471 | -$14,587 |
| Client File No. 52 | 2019 | -$14,400 | -$12,500 |

[10] This is comprised of *labor costs* totaling exactly $2,500 and *material and supplies* totaling exactly $3,500.  These exact numbers were also reported 2020.

[11] This is comprised of *labor costs* totaling exactly $2,500 and *material and supplies* totaling exactly $3,500.  These exact numbers were also reported 2019.

25

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

|  | 2020 | -$14,400 | -$12,110 |
|---|---|---|---|
| Client File No. 58 | 2019 | -$16,900 | -$14,400 |
|  | 2020 | -$16,900 | -$14,400 |
| Client File No. 59 | 2019 | -$9,000 | -$7,500 |
|  | 2020 | -$9,000 | -$7,500 |
| Client File No. 60 | 2019 | -$4,000 |  |
|  | 2020 | -$4,000 |  |
| Client File No. 85 | 2019 | -$10,700 | -$13,500 |
|  | 2020 | -$10,700 | -$13,500 |
| Client File No. 87 | 2019 | -$7,521 | -$25,000 |
|  | 2020 | -$7,395 | -$25,000 |
| Client File No. 96 | 2019 | -$10,500 | -$12,000 |
|  | 2020 | -$10,500 | -$12,000 |
| Client File No. 99 | 2020 |  | -$25,000 |
| Client File No. 100 | 2020 | -$8,555 | -$12,000 |
| Client File No. 102 | 2019 | -$25,000 | -$25,000 |
| Client File No. 106 | 2019 | -$17,000 | -$18,000 |

*Red Flag – All Deductions and Losses Expressed as Round Numbers*

88.     Sellers improperly evaded federal income tax liabilities on behalf of the taxpayers Clients by fabricating and/or by inflating expenses and deductions of taxpayers on Schedules C and E.  This is supported by the fact that almost all of the scheduled deductions were invariably "losses" (rarely was any income reported).  Equally indicative of Sellers 's fraud is that <u>all</u> of the Schedule E deductions were in the form of "*management fees*" and such purported management fee deductions were almost always either reported in "*round numbers*" or were duplicative (cut and pasted) from prior years.  Below is a partial list of Client Files evidencing that fact that the losses were fabricated:

| Client File | Tax Year | Schedule C Deductions | Schedule E Deductions |
|---|---|---|---|
| Client File No. 7 |  | -$12,000 | -$5,000 |
| Client File No. 9 | 2019 | -$19,500 | -$7500 |
|  | 2020 | -$15,000 | -$25,000 |
| Client File No. 11 |  |  | -$12,000 |
| Client File No. 12 | 2019 | -$6,000[12] | -$5,000 |
|  | 2020 | -$6,000[13] | -$5,000 |
| Client File No. 13 | 2018 | -$12,300 | -$15,200 |
|  | 2020 | -$12,000 | -$15,200 |

---

[12] This is comprised of *labor costs* totaling <u>exactly</u> $2,500 and *material and supplies* totaling <u>exactly</u> $3,500.  These exact numbers were also reported 2020.

[13] This is comprised of *labor costs* totaling <u>exactly</u> $2,500 and *material and supplies* totaling <u>exactly</u> $3,500.  These exact numbers were also reported 2019.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

| | | | |
|---|---|---|---|
| Client File No. 14 | 2019 | -$12,000 | -$5,000 |
| | 2020 | -$12,000 | -$5,000 |
| Client File No. 15 | 2019 | -$22,253 | -$10,253 |
| | 2020 | -$25,000 | -$12,000 |
| Client File No. 16 | 2019 | -$16,347 | -$12,487 |
| | 2020 | -$16,347 | -$12,487 |
| Client File No. 17 | 2019 | | -$14,200 |
| | 2020 | -$5,000 | -$14,200 |
| Client File No. 18 | 2020 | -$9,465 | -$12,000 |
| Client File No. 19 | 2020 | -$16,300 | -$12,000 |
| Client File No. 20 | 2020 | -$20,500 | -$12,200 |
| Client File No. 21 | 2020 | -$36,660 | |
| Client File No. 22 | 2019 | -$7,500 | -$15,000 |
| Client File No. 23 | 2019 | -$9,500 | -$12,000 |
| | 2020 | -$9,600 | -$12,200 |
| Client File No. 24 | 2019 | -$12,500 | -$14,100 |
| | 2020 | -$12,500 | -$14,100 |
| Client File No. 25 | 2019 | -$1,605 | -$13,500 |
| | 2020 | -$1,605 | -$13,500 |
| Client File No. 26 | 2020 | -$20,000 | -$5,500 |
| Client File No. 31 | 2020 | -$26,000 | -$5,500 |
| Client File No. 32 | 2019 | -$12,535 | -$12,500 |
| | 2020 | -$12,525 | -$12,500 |
| Client File No. 34 | 2019 | | -$6,500 |
| | | | -$7,500 |
| Client File No. 35 | 2020 | -$21,580 | |
| Client File No. 36 | 2019 | | -$12,500 |
| | 2020 | | -$25,000 |
| Client File No. 37 | 2019 | -$8,550 | |
| | 2020 | -$8,550 | |
| Client File No. 41 | 2019 | -$5,027 | -$6,200 |
| | 2020 | -$5,027 | -$6,200 |
| Client File No. 46 | 2019 | -$18,471 | -$14,587 |
| | 2020 | -$18,471 | -$14,587 |
| Client File No. 48 | 2020 | -$8,150 | -$25,000 |
| Client File No. 52 | 2019 | -$14,400 | -$12,500 |
| | 2020 | -$14,400 | -$12,110 |
| Client File No. 58 | 2019 | -$16,900 | -$14,400 |
| | 2020 | -$16,900 | -$14,400 |
| Client File No. 59 | 2019 | -$9,000 | -$7,500 |
| | 2020 | -$9,000 | -$7,500 |
| Client File No. 60 | 2019 | -$4,000 | |
| | 2020 | -$4,000 | |
| Client File No. 61 | 2019 | -$14,100 | |
| | 2020 | -$14,100 | |
| Client File No. 62 | 2019 | -$10,200 | -$12,000 |
| Client File No. 64 | 2020 | -$16,322 | -$12,000 |
| Client File No. 67 | 2019 | -$8,845 | |
| | 2020 | -$8,845 | |
| Client File No. 82 | 2020 | -$25,000 | -$25,000 |
| Client File No. 84 | 2019 | -$12,853 | -$12,000 |
| | 2020 | -$29,250 | |
| Client File No. 85 | 2019 | -$10,700 | -$13,500 |
| | 2020 | -$10,700 | -$13,500 |
| Client File No. 87 | 2019 | -$7,521 | -$25,000 |
| | 2020 | -$7,395 | -$25,000 |
| Client File No. 92 | 2019 | -$7,500 | -$13,500 |
| | 2020 | -$7,500 | -$13,500 |

27

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

| Client File No. 96 | 2019 | -$10,500 | -$12,000 |
| | 2020 | -$10,500 | -$12,000 |
| Client File No. 102 | 2019 | -$25,000 | -$25,000 |
| Client File No. 106 | 2019 | -$17,000 | -$18,000 |

WHEREFORE, Purchaser demands judgment against Seller and Victor Delerme for all damages Purchaser sustained as a result of Sellers' fraud in the inducement including without limitation, lost profits, and pre-judgment interest, as well as punitive damages, and Purchaser further demands imposition of a constructive trust on any amounts paid by Purchaser to Seller for the improper files, together with costs and such other and further relief as is necessary and proper.

COUNT III – RESCISSION
(Delerme CPA, LLC and Victor Delerme)

89.     Purchaser realleges and reavers their allegations in paragraphs 1 through 58, and 64 to 88, as though fully set forth herein.

90.     Purchaser and Sellers entered into a valid and enforceable Agreement, whereby Purchaser, undertook to acquire certain tax preparation Client Files from Sellers, in exchange for the purchase price of $150,000.

91.     Sellers defrauded Purchasers by delivering Client Files that showed pervasive fraud on the part of the tax preparer, as more fully set forth above.  The fraudulently prepared files in each case generated a false refund payment by the IRS.

92.     Because the falsified tax returns constituted the cornerstone of the Purchase Agreement between Purchaser and Sellers, Purhaser failed to receive the benefit of the Purchase Transaction.

93.     When considering that the primary purpose of the Transaction was for Purchaser to acquire and develop the Book of Business (of which the fraudulent tax returns had now become a part), Purchaser could no longer perform because doing so would make Purchaser potentially

28

complicit with Seller's misconduct. Proceeding with the Transaction would put Purchaser in a situation where Purchaser would violate applicable laws and ethical requirements and where future violation could be anticipated.

94.     On or about February 14, 2022, the Purchaer rescinded the transaction, notified Sellers of same and immediately took steps to prevent the assignment of any further Client Files as a means of restoring any purported benefits from Sellers. Accordingly, Plaintiff elected to void the Agreement because it was induced by fraud.

95.     Based on Purchaser's February 14, 2022 notice of rescission to Sellers, there is no adequate remedy at law available to Purchaser other than to seek rescission.

WHEREFORE, Purchaser demands judgment against Seller and Victor Delerme for rescission of the underlying Transaction, with restitution of amounts paid as an alternative remedy, further demands imposition of a constructive trust on any amounts paid by Purchaser to Sellers for the improper files, costs, as well as such other and further relief as is necessary and proper.

COUNT IV – Negligence
(Delerme CPA, LLC,  Victor Delerme)

96.     Purchaser realleges and reavers her allegations in paragraphs 1 through 58, as though fully set forth herein, as an alternative cause of action.

97.     Sellers owed a duty of care to Purchaser to ensure that the Client Files that were the subject of the Transaction and which Client Files were selected to be transferred to Purchaser, were viable and prepared in accordance with applicable laws and in accordance with ethical requirements.

98.     Sellers either knew or should have known that tax returns were being improperly prepared given the pattern of false claims made on numerous tax returns.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

99.     Sellers breached their respective duties of care to Purchaser by failing to ensure that the Client Files that were the subject of the Transaction and which Client Files were selected to be transferred to Purchaser, were viable and prepared in accordance with applicable laws and in accordance with ethical requirements.

100.    Purchaser was injured as a result of Sellers' breach of its duty of care.

WHEREFORE, Purchaser demands judgment against Seller and Victor Delerme for all damages Purchaser sustained as a result of Sellers's negligence together with costs and such other and further relief as is necessary and proper.

COUNT V – Unjust Enrichment
(Delerme CPA, LLC)

101.    Purchaser realleges and reavers her allegations in paragraphs 1 through 58, as though fully set forth herein, as an alternative cause of action.

102.    Sellers falsely represented a material fact to Purchaser , *i.e.,* that Sellers had prepared the tax returns that comprised the Client Files in accordance with applicable laws and ethical requirements.

103.    As a result of the payment Purchaser made to Seller, a benefit was conferred upon Seller, to wit: the $112,500.00 that were paid by Purchaser to Seller.

104.    The payment made by Purchaser to Seller, was expressly requested by Seller, and was knowingly and voluntarily accepted by Seller.

105.    The $112,500 flowed to Seller on or about January 24, 2022 by wire transfer.

106.    Under the circumstances, it would be inequitable for Seller to retain the benefit conferred upon it without conveying to Purchaser the benefit of the bargain, *i.e.,* viable and legally-compliant Client Files.

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

WHEREFORE, Purchaser demands judgment against Seller for return of the $112,500 paid by Purchaser to Seller, together with costs and interest and such other and further relief as is necessary and proper.

DEMAND FOR JURY TRIAL

Purchaser demands trial by a jury of all issues so triable as of right.

Dated:  April 18, 2022

Respectfully submitted,

**LEHTINEN SCHULTZ PLLC**
*Counsel for Gian Gordon-Whyte, CPA, LLC*
1200 Brickell Avenue, Suite 507
Miami, Florida 33131
Telephone: 305.760.8544
Facsimile:  305.356.5720

By: /s/ Claudio Riedi, Esq.
    CLAUDIO RIEDI, ESQ.
    Florida Bar No. 984930
    criedi@lehtinen-schultz, PLLC


**SANDRA YORK PLLC**
*Counsel for Gian Gordon-Whyte, CPA, LLC*
133 Grand Avenue, Suite A
Coral Gables, FL. 33133
Telephone: 305.229.8888
Facsimile:  305.396.2743


By: /s/ Sandra York
    SANDRA YORK
    Florida Bar No. 10253
    sandra.york@yorkpllc.com

31

## INDEX TO EXHIBITS

Exhibit A          Purchase Agreement dated January 21, 2022 by and among GIAN
                   GORDON-WHYTE CPA, LLC as "Purchaser," DELERME CPA,
                   LLC as "Seller," and VICTOR DELERME, an individual as
                   "Principal."

Exhibit B          Purchaser's Counsel formal notice of default sent to Sellers dated
                   February 14, 2022.

Exhibit C          Seller's means of forwarding new client information (composite).

Exhibit D          Reply to notice of default by Seller's Counsel dated February 17, 2022.

Exhibit E          Second reply to notice of default by Seller's Counsel.

32

# EXHIBIT A TO COMPLAINT

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

## PURCHASE AGREEMENT

This PURCHASE AGREEMENT (the "Purchase Agreement") effective as of January 21, 2022 (the "Effective Date"), is entered into by and among GIAN GORDON-WHYTE CPA, LLC, a Florida limited liability company with registered offices located at 6703 NW 7th Street, KIN 20835, Miami, Florida 33126 by and on behalf of itself, its successors, assigns, Affiliates and/or subsidiaries (hereinafter, collectively, the "Purchaser" or "Company") and DELERME CPA, LLC, a Georgia limited liability company, with principal offices located at 4651 Roswell Road, B105, Atlanta, Georgia 30342 ("Seller") and VICTOR DELERME, an individual and resident of the state of Georgia, whose principal address is 4651 Roswell Road, B105, Atlanta, Georgia 30342 ("Principal"). Seller and Purchaser are sometimes referred to herein collectively as the "Parties" and each singularly as a "Party," as context requires.

## RECITALS

WHEREAS, Purchaser is a Florida limited liability company, that offers professional income tax preparation and planning services to certain individual and business clients in the South Florida market and which company is owned and operated by Gian Gordon-Whyte ("Gordon-Whyte"), an individual and Certified Public Accountant licensed by the Florida Department of Professional Regulation (License No. AC-42591) to practice public accounting;

WHEREAS, Seller is a Georgia limited liability company, that offers online professional tax planning, bookkeeping, accounting and business consulting services to certain individual and business clients and is owned and operated by Principal, a Certified Public Accountant licensed by the Georgia State Board of Accountancy (License No. CPA027251);

WHEREAS, subject to the terms, conditions and limitations set forth in this Purchase Agreement, Purchaser desires to acquire from Seller, and Seller desires to Refer and transfer to Purchaser, that certain segment of Seller's existing business which, as of the Effective Date is valued at the sum of $124,335, and which is based on a factor of 1.20642 per each Client File intending to be Referred and such Client Files are comprised of a total of 107 clients, and of which, approximately 75% or 80 clients either file Form 1040 individual or business income tax returns and with the remaining approximate 25% of such Clients being comprised of other individual and/or business tax matters, including, tax preparation and filings unrelated to Form 1040s, planning, general consulting and IRS examinations (collectively, the "Referred Business");

WHEREAS, subject to the terms, conditions and limitations set forth in this Purchase Agreement, Purchaser additionally intends to pay to Seller or Principal, a New Client Commission per each New Client that is Introduced or Referred by Seller or Principal to Purchaser; and

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises, agreements and covenants set forth in this Agreement, and in reliance upon the representations and warranties contained herein and intending to be legally bound hereby, the Parties hereto hereby agree as follows:

### A G R E E M E N T

1.      Recitals. The foregoing recitals are incorporated into and are made a part of this Purchase Agreement as of the Effective Date.

2.      Definitions. All capitalized terms used herein but not defined shall have the meanings set forth in this Section 2 below:

2.1.      General Interpretive Principles. For purposes of this Agreement, and except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Section have the meanings assigned to them in this Section and shall include the plural as well as the singular, and the use of any gender in this Agreement shall be deemed to include the other gender; (ii) the word "including" means "including, but not limited to"; and (iii) the headings in this Agreement are for convenience only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of any of the provisions of this Agreement.

2.2.      "Affiliate" means, with respect to any Person, a Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the Party in question. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

2.3.      "Applicable Law" means any applicable order, law, statute, regulation, rule, pronouncement, ordinance, bulletin, writ, injunction, directive, judgment, decree, principle of common law, constitution or treaty enacted, promulgated, issued, enforced or entered by any federal, territorial, state, provincial or local governmental authority or subdivision, department, branch, or commission thereof, or any court or judicial body, applicable to or having jurisdiction over the Parties hereto, or any of their respective businesses, properties or assets.

1

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

2.4.    "Client(s)" shall collectively refer to that certain amalgam of existing Seller clients or client files, which as of the Effective Date, totals 107 and is heretofore defined as the Referred Business. Clients are more particularly set forth on Schedule A, which Schedule is attached hereto and is made a part hereof and excludes New Clients.

2.5.    "Client Files" means all books, records, data, information, files, notes and papers, whether in hard copy or otherwise possessed by Seller in connection with providing professional services to Clients, including without limitation, any and all information relating to the taxpayers that comprise the Referred Business, as well as, all related income tax returns, tax packages, tax opinions and tax representation letter, engagement letters, taxpayer names and contact information including the taxpayer's address, telephone numbers and email addresses, copies of, and information relating to, federal, state and/or local income tax returns filed by or on behalf of Client; software files (including CCH files) relating to Clients, Client user names, passwords, identification numbers and other credentials, Client QB files and records, all previously filed income tax returns (last 3 years), all Client communication including communications relating to document requests and/or Client information relating to payments.

2.6.    "Client List" shall mean the list of Clients described on Schedule A of this Agreement.

2.7.    "Closing" has the meaning set forth in Section 6.

2.8.    "Closing Date" has the meaning set forth in Section 6.

2.9.    "Confidential Information" means (i) all documents and information concerning one Party or any of its Affiliates furnished to the other Party or such other Party's Affiliates or representatives in connection with this Purchase Agreement or the transactions contemplated hereby, including any information described in writing as, or documents marked as "confidential" by the disclosing Party, or documents that by their nature fall within the purview of this Purchase Agreement, including but not limited to financial statements (profit and loss/balance sheet), Seller's QuickBooks files, Seller's, Tax Returns, pricing or rate sheets, forecasted pricing information, Client information, including but not limited to Client Name, Client contact, information, Client Tax filing information, list of Clients that are the subject of examination and related Client File information, service offerings, Client engagement agreements, vendor agreements, license agreements, marketing materials (e.g., tax season email, tax return completion email, payment solicitation emails, Seller banking information, Bizpayo account information, Client work papers, Client tax returns, software license information, software log-in credentials, Client software file, Seller communications with Department of Treasury relating to Seller operations, any information or documents related to the disclosing Party's trade secrets, technology, software, know-how, products, potential products, services, potential services, markets and/or business information and all other documentation and information provided by the disclosing Party to the receiving Party in connection with the transaction, whether disclosed or provided electronically, orally or in writing, regardless of the media being used, before or after the execution of this Purchase Agreement; (ii) any personally identifiable or private information of Client of disclosing Party that is or may be protected pursuant to the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999) or any amendments thereto; The Health Insurance Portability and Accountability Act of 1996 or any amendments thereto; and/or any other federal, state or local laws, regulations or ordinances governing the privacy of Personal Client Information, including but not limited to medical information (such laws, regulations and ordinances shall be referred to herein as "Privacy Law(s)" and such personally identifiable or private information shall be referred to herein as "Personal Client Information"); and (iii) all research, studies, analyses or similar documents produced by the Receiving Party which contain or are based on any Confidential Information." "Confidential Information" shall also include any documents or other materials that are or may be protected by the attorney-client, work product, joint defense or other applicable legal privilege. "Confidential Information" shall not include documents or information which: does not include the following (unless such Confidential Information remains subject to any Privacy Law(s)): (a) Information which was publicly known and generally available in the public domain at the time of its disclosure by the disclosing Party; (b) Information which after disclosure to the Receiving Party becomes part of the public domain, except by breach of this Purchase Agreement or other unlawful means; (c) Information that has been or hereafter is intentionally disclosed without restriction of any kind by the disclosing Party to the public; (d) Information that is independently developed or acquired by Purchaser or Seller or either Party's Affiliates without use of or reference to the disclosing Party's Confidential Information, as shown by reasonable evidence in the receiving Party's possession; (e) Information that is disclosed to the receiving Party by another source, which source is not known by the receiving Party to be bound by a confidentiality obligation with the disclosing Party; and (f) Information that is already in the receiving Party's possession prior to disclosure by the disclosing Party.

2.10.    "Consideration" has the meaning(s) set forth in Paragraphs 4 and 4.1.4

2.11.    "Effective Date" has the meaning set forth in the Preamble.

2.12.    "Governmental Entity" means any foreign, domestic, federal, territorial, state, provincial or local governmental authority, quasi-governmental authority, instrumentality, court or government, self-regulatory organization, commission, tribunal or organization or any political or other subdivision, department, branch or representative of any of the foregoing.

2.13.    "Income Taxes" mean: (a) all Taxes based upon, measured by, or calculated with respect to (i) net income or profits (including, any capital gains, minimum tax or any Tax on items of tax preference, but not including sales, use, real, or personal property, gross or net receipts, value added, excise, leasing, transfer or similar Taxes), or (ii) multiple bases (including, corporate franchise, doing business and occupation Taxes) if one or more bases upon which such Tax is determined is described in clause (a)(i)

2

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  | Miami, Florida 33131  | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

above; and (b) any related interest and any penalties, additions to such Tax or additional amounts imposed with respect thereto by any Taxing Authority.

2.14.   "Income Tax Return" means all Tax Returns that relate to Income Taxes.

2.15.   "Indemnified Party" has the meaning set forth in Section 10.3.

2.16.   "Indemnitor" has the meaning set forth in Section 10.3.

2.17.   "Introduce," "Introduction" or "Introducing" refers to the act(s) by Seller of professionally presenting either Purchaser or Gordon-Whyte (as context requires) to Clients and New Clients for purposes of inducing Clients or New Client to use the professional tax services of Purchaser and whereby Seller may provide to the Referred Business Clients or to New Client(s) contact information relating to Purchaser or Gordon-Whyte, such as (i) name, (ii) email address, (iii) business telephone numbers, (iv) cell phone numbers (to the extent pre-approved by Gordon-Whyte); (v) a summary of Gordon-Whyte's professional background, which ought to reference Gordon-Whyte as a senior tax professional and Certified Public Accountant; and (vi) an endorsement by Seller of the professional capabilities of Purchaser and/or Gordon-Whyte, using a variety of methods including, but not limited to, presentations on Seller's Website, emailing announcements, posting announcements on the firm's official social media channels, by disseminating newsletters to Client (the content of which shall be mutually agreed to the parties) and by using other usual and customary online marketing methods, as may be deemed appropriate by the Parties.

2.18.   "Liabilities" means any direct or indirect debt, indebtedness, commitment, liability, claim, loss, damage, deficiency, obligation or responsibility of any kind or nature, whether accrued, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, contingent, absolute, known or unknown, due or to become due, determined, determinable or otherwise.

2.19.   "Losses" means any and all liabilities, obligations, claims, demands, actions, suits, proceedings, payments, awards, judgments, damages, losses, costs, expenses, settlement payments, penalties, fines and interest, and all reasonable attorneys' fees and out of pocket costs and expenses (including reproduction, mail and delivery costs and travel expenses). "Losses" shall also include any premium taxes, premium refunds, commissions, loss in excess of policy limits, extra-contractual obligations, assessments, special, punitive or consequential damages, statutory reserves including reserves for unearned premiums, known losses, incurred but not reported loss and expense, and loss adjustment expense, and regardless of when such Loss was or is asserted or incurred.

2.20.   "New Client(s)" has the meaning set forth in Section 3.7 and shall exclude Clients.

2.21.   "New Client Commission" shall have the meaning set forth in Paragraph  4.2.1 of this Agreement.

2.22.   "Notice of Claim" has the meaning set forth in Section 10.3.

2.23.   "Party" and "Parties" have the meanings set forth in the Preamble.

2.24.   "Person" means any natural person, corporation, general partnership, limited partnership, limited liability company or partnership, proprietorship, other business organization, trust, union, association or Governmental Entity.

2.25.   "Personal Client Information" has the meaning set forth in Section 2.7.

2.26.   "Principal" has the meaning set forth in the Recitals.

2.27.   "Privacy Law(s)" has the meaning set forth in Section 2.7.

2.28.   "Purchaser" has the meaning set forth in the Preamble.

2.29.   "Purchaser Indemnified Parties" has the meaning set forth Section 10.1.

2.30.   "Refer" or "Referring" collectively means the act(s) or actions by Seller, Principal and/or by their Representatives of (i) formally and professionally presenting either Purchaser or Gordon-Whyte (as context requires) to those certain Clients and New Clients with the specific intention of endorsing the professional capabilities of Purchaser and/or Gordon-Whyte and inducing, persuading and/or encouraging such Clients or New Client to use (and to continue using) the professional tax services of Purchaser or Gordon-Whyte (as context requires) and (ii) working cooperatively with Purchaser, Gordon-Whyte and their respective Representatives and to enhance the online professional brand, standing and profile(s) of Gordon-Whyte and Purchaser in the "Form 1040" market in which Seller currently operates.

2.31.   "Referred Business" means the Clients.

3

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

2.32.     "Representatives" has the meaning set forth in Section 9.4.

2.33.     "Retained Liabilities" has the meaning set forth in Section 3.6.

2.34.     "Seller" has the meaning set forth in the Preamble.

2.35.     "Seller Indemnified Parties" has the meaning set forth in Section 10.2.

2.36.     "Seller Operations" means Seller's existing business including the Referred Business.

2.37.     "Seller's Website" refers to the published web pages and related content identified by the domain name www.delermecpa.com.

2.38.     "Tax" or "Taxes" whether used in the form of a noun or adjective, means taxes on or measured by income, franchise, gross receipts, sales, use, excise, payroll, personal property, real property, ad-valorem, value-added, leasing, leasing use, unclaimed property or other taxes, levies, imposts, duties, charges, or withholdings of any nature. Whenever the term "Tax" or "Taxes" is used it shall include penalties, fines, additions to tax and interest thereon.

2.39.     "Tax Package" means a pro forma Income Tax Return relating to a Client and/or to a Client's business operation or interest that is required to be included in an Income Tax Return and/or which is required to be filed by a Client; and all information relating thereto and/or which information is reasonably necessary to prepare and file such pro forma Tax Return consistent with past practices.

2.40.     "Tax Representation Letters" means any writing that contains certain representations and covenants issued by or on behalf of Seller or Principal on behalf of a Client, including related tax opinions.

2.41.     "Tax Returns" mean any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return, amended tax return, claim for refund, or declaration of estimated Tax) required to be supplied to, or filed with, a Taxing Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Taxes.

2.42.     "Taxing Authority" means any governmental authority or any subdivision, agency, commission, or authority thereof or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection, or imposition of any Tax, including the IRS.

3.     Referral Structure.

3.1.     Referral Process. Subject to the terms and conditions set forth in this Purchase Agreement, Seller and Principal shall (a) Refer the Clients to Purchaser (and/or to Gordon-Whyte as context requires) and may also (b) elect (but shall not have the obligation to) Introduce Gordon-Whyte to the Clients, in the manner, and using the methods, contemplated by Composite Schedule B or as otherwise mutually agreed to by the Parties. The Referrals and Introductions (to the extent applicable) shall commence on or about Monday, January 24, 2022, with all initial Client contacts being initiated by  January 31, 2022.  In addition to the obligations and rights otherwise set forth in this Agreement, including in this Section 3.1, Seller and Principal shall, at Seller's cost and expense, additionally:

(i)     create an official email account associated with Seller's business and which email account shall include refer to the domain "delermecpa.com" and professional brand for continuous use by Gordon-Whyte after Closing through October 15, 2022;

(ii)     disseminate an email announcement to Seller's Clients announcing Gordon-Whyte's new affiliation with the Seller's accounting practice and highlighting Gordon-Whyte's professional background and areas of tax specialty;

(iii)     update Seller's official Website (delermecpa.com) to include a professional profile featuring Gordon-Whyte as a tax professional associated with Seller's accounting practice and such professional profile shall be approved in advance by Purchaser and Purchaser shall have the right, but not the obligation to elect to include a photograph of Gordon-Whyte as part of Gordon-Whyte's professional profile;

(iv)     maintain Gordon-Whyte's professional profile on Seller's official website following the execution and delivery of this Agreement and following Closing of the business transaction to which this Purchase Agreement relates through October 15, 2022; and

(v)     change and/or update Gordon-Whyte's professional profile on Seller's official website if and

4

1/20/22 4:46:04 PM

36

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 |  www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

when requested by Purchaser one time after the initial joint approval.

Any announcements, posts, press and the like, concerning the transaction contemplated by this Purchase Agreement shall be made only after the Effective Date in the form mutually agreed to by the Parties.

        3.2.     Referral of Referred Business. Subject to Applicable Law regarding the protection and use of personal Client Information, Seller and Principal covenant and agree to: (a) maintain all written consents necessary to Refer the Client Files and to otherwise effectuate the obligations set forth in this Purchase Agreement, if any; (b) cooperate with Purchaser in communicating with Clients as necessary and appropriate to refer the Referred Business to Purchaser; (c) use diligent efforts to take such actions as are deemed necessary and appropriate to facilitate Purchaser's use and exploitation of the Client Files under this Purchase Agreement and to otherwise cause Purchaser to make optimal use of the Referred Business and Client Files; and (d) provide Purchaser, beginning on the Effective Date and continuing for so long as necessary and with reasonable access to systems and data used in conjunction with the operation and servicing of the Referred Business and Clients. This specifically includes the communication, cooperation and exchange of data by and between Seller's staff and/or representatives and Purchaser's staff and/or representatives.

        3.3.     Operational Support; Transition. In addition to the obligations otherwise set forth in this Agreement, Principal, or Principal's manager or staff who are qualified to provide consultation, shall, as needed, dedicate up to two (2) hours per week for up to six (6) months to facilitate transition of the Referred Business and conferring with Gordon-Whyte on Client matters.

        3.4.     Cooperation; Further Assurances. Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions or do, or cause to be done, all things or execute any documents necessary, proper or advisable to consummate and make effective the transactions contemplated by this Purchase Agreement and any other agreements contemplated hereby or thereby, subject to their respective terms. Seller and Purchaser shall execute any additional documents, instruments or conveyances and make any filings of any kind which may be reasonably necessary to carry out any of the provisions of this Purchase Agreement. If and to the extent that any Governmental Entity consents are necessary for this Purchase Agreement or the transactions contemplated herein, Seller and Purchaser covenant to use commercially reasonable efforts to obtain all consents, approvals and agreements of, and to give and make all notices and filings with, any Governmental Entity necessary to authorize, approve or permit the consummation of the transactions contemplated by this Purchase Agreement and any other agreements contemplated hereby. On and after the Effective Date, Principal and Seller will provide commercially reasonable assistance to Purchaser in connection with the investigation of, response to or defense of any suit, action or proceeding with a third party that relates to the Referred Business. Each of the Parties shall take such actions, do such things and shall promptly execute and deliver such further documents or instruments as may be reasonably required in order to consummate the transactions contemplated hereby.

        3.5.     Assumed Liabilities. The Parties acknowledge and agree that Purchaser is not acquiring Seller or any of Seller's assets other than the Referred Business and that Seller shall not be liable for any of Seller's liabilities, except that after the Effective Date of the transaction, Purchaser shall be responsible for potential claims and/or liabilities arising from Purchaser's delivery of professional services to such Clients. With respect to the Referred Business, Seller shall retain all Liabilities that accrued prior to the Effective Date, to the same extent that Seller had such Liabilities in the absence of this Purchase Agreement and Purchaser shall retain any and all Liabilities that accrued after the Effective Date to the extent arising from the delivery of Purchaser's professional services to such Clients.

        3.6.     Retained Liabilities. Seller recognizes and agrees that Purchaser is not acquiring any ownership interest whatsoever in Seller under this Purchase Agreement. Therefore, in addition to Liabilities being retained by Seller under Section 3.5, Seller is, and will continue to be after the Effective Date, liable and responsible for all Liabilities relating to the operations and status of Seller before and after the Effective Date. This includes, but is not limited to, all liabilities and expenses of every kind and description relating to Seller's operating costs, overhead expenses, real and personal property, equipment, licenses, leases, pending and threatened litigation, utilities, taxes payable to any Governmental Entity, compliance with Applicable Laws, regulatory violations and pending and threatened proceedings or inquiries regarding regulatory violations from any Governmental Entity, actual or alleged environmental violations, loans or other indebtedness, liens, contractual obligations, and salaries and benefits of employees. In addition, to the extent Principal is responsible or liable for any of the foregoing Liabilities, arising out of their ownership of Seller, or serving as a member, manager, officer or director of Seller, Purchaser shall have no responsibility or liability whatsoever for any such Liabilities, and Principal shall retain full liability and responsibility for such Liabilities. The foregoing shall not apply to those Liabilities expressly assumed by Purchaser either under this Purchase Agreement which shall not be construed to create, suggest or imply the acquisition of any ownership of Seller by Purchaser, or any obligations or Liabilities relating thereto. The Liabilities retained by Seller and Principal under this Section 3.6 shall be referred to as the "Retained Liabilities."

        3.7.     New Clients. In addition to Referring existing Clients to Purchaser, Seller may in Seller and/or Principal's sole discretion also elect to solicit and Refer new clients to Purchaser subsequent to the Effective Date (the "New Clients").

        3.8.     Expenses. Except as otherwise specifically provided in this Purchase Agreement, Seller and Purchaser will bear their respective expenses incurred in connection with the preparation, execution and performance of this Purchase Agreement and the consummation of the transactions contemplated hereby.

5

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

      3.9.    <u>Limitations on Seller's Operations</u>. Seller and Principal shall not merge, consolidate, restructure, reorganize, or effectuate a dissolution of Seller without the prior written consent of Purchaser which shall be granted upon Purchaser's satisfaction that the spirit and obligations under this Purchase Agreement have been satisfied and that all of Seller's and Principal's respective Liabilities under this Purchase Agreement have been extinguished.

      4.    <u>Consideration</u>. In consideration for the Referred Business and for potentially Referring New Clients, Purchaser shall, subject to the terms set forth in this Section, pay to Seller, the amounts specified in Paragraphs 4.1 and 4.2, below (the "<u>Consideration</u>").

      4.1.    <u>Purchase Price.</u>  In exchange for the Referred Business and subject to the additional terms set forth in this Section, Purchaser shall, remit to Seller, in cash, the purchase price of One Hundred Fifty Thousand Dollars ($150,000.00) as set forth in Paragraphs 4.1.1 and 4.1.2.

      4.1.1.    <u>Initial Payment</u>. Upon full execution of this Agreement, Seventy-five percent (75%) of the Consideration or One Hundred Twelve Thousand Five Hundred Dollars ($112,500.00) shall be immediately due and payable to Seller as an Initial Payment; and

      4.1.2.    <u>Final Payment</u>. On or before April 30, 2022, Twenty-Five (25%) of the Consideration or Thirty Seven Thousand Five Hundred Dollars ($37,500.00), shall be due and payable to Seller as a Final Payment subject to the adjustment(s) terms and limitations of Section 4.13.

      4.1.3.    <u>Adjustment</u>. The Parties acknowledge and agree that the Consideration is based on a "per-Client" factor of 1.20642 of revenue produced by each of the 107 Clients for the Seller in 2021 as is stated in Schedule 1. If, following the Closing of this Business Referral transaction, Seller is, using commercially reasonable standards, unable to provide Purchaser with active 2022 communication with any of the 107 Clients due to such Client's refusal or failure to communicate with Seller and/or Purchaser by March 15, 2022, the Purchase Price shall automatically and without further notice or demand be adjusted downward and in amount equal to the factor of 1.20642 times each applicable individual Client's 2021 stated revenue ("<u>Adjustment</u>" or "Adjusts")). If any of the 107 Clients cannot be communicated with, has died, or otherwise disappeared then Purchaser shall be entitled to an Adjustment to the Purchase Price, except to the extent limited by Paragraph 4.1.4 below. Adjustments shall be capped and/or limited to the projected sum of the Final Payment. In the event a Client refuses the services of Purchaser and insists on staying with Seller for any reason, and after Seller confers with Purchaser regarding same, Seller and Principal shall have the option to elect to continue servicing such Client, and in such case, Purchaser shall be entitled to a Purchase Price Adjustment in accordance with Paragraph 4.1.3 above and such Client shall be removed from Schedule A. In the event Seller rejects the Client's insistence, then Seller shall refrain from offering or performing any further services to the Client and said file shall be treated as common breakage without Adjustment.

      4.1.4.    <u>Reversals on Adjustments</u>. Notwithstanding Purchaser's right to make Adjustments in accordance with, and as contemplated by, the terms of Paragraph 4.1.3 above, Purchaser shall not be entitled to Adjust the Purchase Price in cases where (a) a Client was initially Referred to Purchaser by Seller, but subsequent to such Client Referral, the Referred Client(s) then either refuses, is unable and/or is otherwise unwilling, to, transfer its or their engagement to Purchaser and (b) as a result of the foregoing, Purchaser Adjusts the Purchase Price as permitted under Paragraph 4.1.3 above, and (c) Client subsequently proceeds to engage the professional services of Purchaser or Gordon-Whyte, Seller shall be entitled to a credit equivalent to the sum of the Adjustment initially taken by Purchaser and the amount of such credit shall be remitted to Seller within 30 days of such subsequent Client engagement by Purchaser.

      4.2.    <u>Additional Consideration</u>.

      4.2.1.    <u>New Client Commission</u>.  In exchange for Seller soliciting, Introducing and Referring New Clients to Purchaser as contemplated under Paragraph 3.7, Seller shall receive from Purchaser, a New Client Commission for all New Clients accepted by Purchaser. Such New Client Commissions due Seller, per each New Client Introduced by Seller and accepted by Purchaser, shall equal 50% of the total fees billed by Purchaser to such New Client for professional services performed by Purchaser in the initial twelve month period following  Purchaser's engagement of the New Client Referral and to the extent, such fees are subsequently paid to Purchaser by a New Client regardless when payment is made.

      4.2.2.    <u>Commission Due Dates</u>. In exchange for performing the obligations set forth in this Agreement, Company shall, subject to the terms of this Agreement, pay Seller the New Client Commission as described in Section 4.2.1. New Client Commissions shall be remitted to Seller or to Seller within 10 days of Company's receipt of any payment from New Client. The Parties acknowledge and agree the New Client Commissions shall not be calculated or paid on costs incurred by Principal or Seller and shall only be paid if the New Client Referral is generated as a lead from of the efforts of Principal and/or Seller. A Report of New Clients referrals made, accepted and payments related thereto shall be continuously maintained by Purchaser and shared with Seller and/or Principal within five (5) business days of their written request.

      4.3.    <u>Offset</u>. Purchaser shall, at all relevant times during and after the Term of this Purchase Agreement, have the right (without further notification or demand and without any further consent of Seller or Principal) to adjust, deduct, reallocate, retain and reapply from any or all sources including any commissions that are earned but not yet remitted, escrow deposits held by and/or on

6

1/20/22 4:46:04 PM

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

behalf of Seller but not yet remitted, including monies held by third parties (i) to secure Seller's and Principal's respective obligations under this Purchase Agreement; (ii) as a legal remedy or to satisfy any actual or threatened claims against Purchaser for which Seller or Principal owes and indemnification duty; and/or (iii) to account for any adjustments to the Consideration as forecasted. The terms of this provision shall indefinitely survive the termination of this Purchase Agreement. In addition to the foregoing, Seller and Principal each agree that in the event of any failure or inability of Seller or Principal to honor their indemnification obligations set forth in this Section, Purchaser may withhold any then-unremitted Consideration and shall have the right to elect to apply such unremitted amounts to satisfy Seller's and Principal's indemnification obligations and any future indemnification obligations reasonably anticipated by Purchaser. Purchaser's right to withhold Consideration or other amounts due under this Section is not intended to and shall not cap or limit Seller's or Principal's Liabilities under this Agreement.

5.     Ownership of Files. All Referred and accepted Client Files shall be deemed the sole property Purchaser, free from any claim whatsoever by Seller or Principal and Seller hereby irrevocably transfers and assigns to Purchaser all rights, title and/or interests therein and Seller and Principal hereby disclaims any proprietary rights, title and/or interests therein. Seller acknowledges and agrees to the foregoing notwithstanding the fact that such Client Files may be maintained on Seller computer servers.

6.     Closing. The closing of the business transactions contemplated by this Purchase Agreement (the "Closing") shall take upon the execution and delivery of the following and which is scheduled to occur on or before Friday, January 21, 2022 (the "Closing Date").

6.1.     Purchaser Deliveries. At the Closing, the Purchaser shall tender and deliver to the Seller the following:

(i)     the Consideration due pursuant to Section 4.1.1, which consideration shall be transmitted to Seller using the wire transfer instructions set forth on Schedule D; and

(ii)    certified resolutions of the Purchaser authorizing the execution, delivery and performance of this Purchase Agreement and the consummation of the transactions contemplated by this Purchase Agreement.

6.2.     Seller Deliverables. At the Closing, upon verification of receipt of funds, Seller shall deliver to Purchaser the following:

(i)     An unredacted Client List with a Bill of Sale for the Referred Business followed by the deliverables in Seller's possession as set forth in Schedule C within five (5) business days of receipt of Purchaser's payment;

(ii)    any and all documents or other evidence of transfer as may be reasonably required as would customarily be provided given the nature of the business transaction being contemplated by the Purchaser to transfer Seller's interest in the Referred Business; and

(iii)   certified resolutions of the Seller authorizing the execution, delivery and performance of this Purchase Agreement and the consummation of the transactions contemplated by this Purchase Agreement.

(iv)    a credit to Purchaser against the Purchase Price for any funds received by Seller from any of the Clients for prospective services which are to be performed by Purchaser.

7.     Representations and Warranties of Seller. Seller and Principal, jointly and severally and collectively represent and warrant to Purchaser that, as of the Effective Date:

7.1.     Corporate Authority. Seller and Principal have full power and authority to enter into and perform this Purchase Agreement and this Purchase Agreement when executed, shall constitute binding obligations of Seller in accordance with its terms.

7.2.     Non-Contravention. The execution and delivery of, and performance by, Seller and Principal of their respective obligations under this Purchase Agreement shall not: (a) result in a breach of any provision of the articles of organization, operating agreement or other governing document of Seller; or (b) result in a breach of any order, judgment or decree of any court or Governmental Entity to which Seller or Principal is a Party or by which Seller or Principal are bound.

8.     Representations and Warranties of Purchaser. Purchaser represents and warrants to Seller that, as of the Effective Date:

8.1.     Corporate Authority. Purchaser has full power and authority to enter into and perform this Purchase Agreement and this Purchase Agreement, when executed, shall constitute a binding obligation of Purchaser in accordance with its terms.

8.2.     Non-Contravention. The execution and delivery of, and performance by, Purchaser of its obligations under

7

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

this Purchase Agreement shall not: (a) result in a breach of any provision of the articles of organization, operating agreement or other governing document of Purchaser; or (b) result in a breach of any order, judgment or decree of any court or Governmental Entity to which Purchaser is a Party or by which Purchaser is bound.

    9.  <u>Covenants</u>. The Parties agree as follows:

      9.1  <u>Notices of Certain Events</u>. Each Party will promptly notify the other Party of: (a) any notice or other communication received from any individual, corporation, partnership, limited liability company, Governmental Entity, estate, or other entity alleging that the consent of such is or may be required in connection with the transactions contemplated by this Purchase Agreement; (b) any notice or other communication received relating to the transactions contemplated by this Purchase Agreement and any other significant notices or other communications from any Governmental Entity; and (c) any actions, suits, claims (other than claims under contracts in the ordinary course of business consistent in all material respects with past practice), investigations or proceedings commenced or, to such Party's knowledge, threatened against, relating to or involving or otherwise affecting such Party that relate to the Referred Business, or that relate to the consummation of a transaction contemplated by this Purchase Agreement.

      9.2  <u>Licenses; Regulatory Compliance</u>. The Parties and their respective employees shall comply with all Applicable Laws relating to their conduct in performing their obligations under this Purchase Agreement. Seller will cooperate (and will continue to cooperate) with Purchaser in making, as soon as practicable following the Effective Date hereof, all regulatory filings, if any, required for the Purchaser to be in compliance with Applicable Law as regards the covenants and agreements herein and the transactions contemplated hereby. The Parties will cooperate to develop mutually agreeable processes and procedures for the administration of all requirements under Applicable Law with respect to the Referred Business, if any.

      9.3  <u>Ownership</u>. Seller acknowledges that the intent of this Purchase Agreement is to convey all rights, title and interest in the Referred Business to Purchaser. Seller will not retain and will not sell, assign, transfer or otherwise convey any of the Referred Business and will not assign, transfer or facilitate the transfer of the Referred Business to any individual, corporation, partnership, limited liability company, Governmental Entity, estate, or other entity other than the Purchaser, except to the extent required under Applicable Law.

      9.4  <u>Confidentiality</u>. The Parties agree that, other than as provided by this Purchase Agreement and to the extent permitted or required to implement the transactions contemplated by and to comply with and enforce the terms of this Purchase Agreement, each Party will keep confidential and will not use or disclose another Party's Confidential Information (including, without limitation, the terms and conditions of this Purchase Agreement and the exhibits and schedules hereto), except as otherwise required by Applicable Law or as may be agreed in writing by the Parties hereto; provided, however, that a Party may disclose the Confidential Information of the other party and the terms and conditions of this Purchase Agreement to such party's officers, directors, employees, attorneys, accountants, and auditors ("<u>Representatives</u>") having a legitimate need to know such information, and as required by action of any Governmental Authority, provided such Representatives and Governmental Authority are advised of the confidential nature of the information made available and such party requires its Representatives to agree to comply with the terms of this Purchase Agreement applicable to such information. Each of the Parties shall be responsible for the breach of this Purchase Agreement by its Representatives and agrees to take all reasonable measures to restrain its Representatives from prohibited or unauthorized disclosure or use of the Confidential Information. For avoidance of doubt, a Party's Representatives who have not received, and have not been provided access to Confidential Information, will not be bound by or subject to the terms of this Section. None of the Parties shall disclose any non-public financial or Personal Client Information gathered, seen, handled, analyzed, reviewed or in the course of their performance under this Purchase Agreement and all of the Parties shall in all respects comply with all Applicable Laws relating to the safeguarding of such Personal Client Information. Each Party shall maintain appropriate security procedures and practices appropriate to the nature of the Personal Client Information to protect the Personal Client Information from improper maintenance, and from unauthorized access, destruction, use, modification, or disclosure.

      9.5  <u>Non-Solicitation</u>. In exchange for the good and valuable consideration being provided under this Agreement by the Parties, Seller and Principal each agree not to: (a) solicit or attempt to solicit or induce or attempt to induce any Client or New Client to either terminate their relationship with the Purchaser or with Gordon-Whyte in order to become a client of Seller or Principal; or (b) provide any Client or any New Client, professional accounting products or services that are competitive with the products or services being offered to such Client or New Client by Purchaser or Gordon-Whyte. If any restriction set forth in this Paragraph is found by any court of competent jurisdiction to be unenforceable, such restriction shall extend only to the extent that such court shall determine it to be enforceable. Both Parties will continue to pursue and build their own respective practices with no obligation to the other except as described herein. The Parties acknowledge and agree that if (a) Seller "takes back" a Client that had been previously Referred to Purchaser but which Client then subsequently either refused, or was unable and/or unwilling, to, transfer its or their engagement to Purchaser and (b) Seller then engages or re-engages such Client following such Client's, shall not be deemed a breach of either the terms or the spirt of this Paragraph 9.5 by Seller.

    10.  <u>Indemnification</u>.

      10.1.  <u>Indemnification by Seller and Principal</u>. Seller and Principal agree, jointly and severally, to indemnify, defend and hold Purchaser and its Affiliates, and each of their respective officers, directors, shareholders and employees (the "<u>Purchaser Indemnified Parties</u>"), harmless from and against any and all Losses which any of the Purchaser Indemnified Parties shall incur or suffer

8

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

arising out of or resulting from: (a) any and all Liabilities that may be incurred by or asserted against any of the Purchaser Indemnified Parties at any time or from time to time arising out of or related to the Retained Liabilities except to the extent that such Liabilities arise out of a breach by Purchaser of any provisions of this Purchase Agreement; and/or (b) the Liabilities described in Section 3 of this Purchase Agreement; and/or (c) any uncured breach of or failure by Seller or Principal to perform any covenant or obligation of Seller or Principal under this Purchase Agreement.

      10.2.   Indemnification by Purchaser.  Purchaser agrees to indemnify, defend and hold Principal and Seller and its Affiliates, and each of their respective officers, directors, shareholders and employees (the "Seller Indemnified Parties"), harmless from and against any and all Losses which any of the Seller Indemnified Parties shall incur or suffer arising out of or resulting from: (a) any and all Liabilities that may incurred by or asserted against any of the Seller Indemnified Parties at any time or from time to time arising out of related to the Referred Business and/or New Clients except to the extent that such Liabilities arise out of a breach by Seller or Principal of any provisions of this Purchase Agreement; and/or (b) any  uncured breach of or failure by Purchaser to perform any covenant or obligation of Purchaser under this Purchase Agreement.

      10.3.   Notice of Claims. Any Party seeking indemnification under this Purchase Agreement (the "Indemnified Party") shall give to the Party from which indemnification is sought (the "Indemnitor") a written notice (a "Notice of Claim") describing in reasonable detail the facts giving rise to and the basis for any claim for indemnification hereunder and shall include in such Notice of Claim (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provisions of this Purchase Agreement or any other agreement, document or instrument executed or delivered hereunder or in connection herewith upon which such claim is based.

      10.4.   Exclusion of Certain Losses.  Notwithstanding anything to the contrary contained in this Purchase Agreement and except to the extent arising from fraud, intentional misrepresentation or intentional breach, neither Party shall be liable to the other for any Losses which constitute special, consequential, punitive or exemplary damages, including those which are attributable or related to diminution of value, lost profits, lost opportunity or similar damages (in all cases, other than amounts paid or payable to third parties in connection with third party claims).

      11.   Miscellaneous.

      11.1.   Independent Contractor Status. This Agreement shall not be construed to make either Party an employee, partner or joint venturer of the other.  The relationship between the parties shall be that of an independent contractor under this Agreement. Neither Party shall have the right to enter into any agreement, or to assume any liability, on behalf of the other, or to bind or commit the other in any manner without the prior written consent of the other.

      11.2.   Assignment. No rights, title and/or interests in and to this Agreement shall be assigned and any assignments or attempted assignments in contravention of this Purchase Agreement shall be void *ab initio*.

      11.3.   No Third-Party Beneficiaries. The Parties acknowledge and agree that the rights, benefits and interests in and to this Purchase Agreement are intended solely for and shall be for the benefit of the Parties hereto and no provisions of this Purchase Agreement shall be conferred on any third party(ies) any right, remedy, claim, liability, reimbursement, cause of action or interest except that Gordon-Whyte shall be deemed an intended third-party beneficiary hereunder.

      11.4.   Entire Agreement. This Purchase Agreement including all schedules and exhibits attached hereto or thereto, constitute the entire agreement between the Parties respecting the subject matter hereof and there are no understandings other than as expressed in this Purchase Agreement. Upon execution and delivery, this Purchase Agreement shall supersede any prior understandings, agreements or representations by or among the Parties, whether written or oral, relating to the subject matter hereof, including any terms sheet which may have preceded this Purchase Agreement.

      11.5.   Severability. Unless the invalidity or unenforceability of any provision or portion thereof frustrates the intent of the Parties or the purpose of this Purchase Agreement, such invalidity or unenforceability will not affect the validity or enforceability of the other provisions or portions thereof.  In the event that such provision will be declared unenforceable by an arbitrator or court of competent jurisdiction, such provision or portion thereof, to the extent declared unenforceable, will be stricken.  However, in the event any such provision or portion thereof will be declared unenforceable due to its scope, breadth or duration, then it will be modified to the scope, breadth or duration permitted by law and will continue to the be fully enforceable as so modified.

      11.6.   Amendments and Waivers. This Purchase Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only in writing executed by all Parties, or in the case of waiver, by the Party waiving compliance.

      11.7.   Rights and Remedies. The Parties shall have all rights and remedies available at law or equity, which may be exercised in any order, in such party's sole discretion, and such rights and remedies shall be cumulative, and not exclusive.  No right or remedy conferred upon or reserved to any Party by this Purchase Agreement shall exclude any other right or remedy, but each such right or remedy shall be cumulative and shall be in addition to every other right or remedy hereunder or available at law or in equity.

9

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720  |  www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

11.8.    Governing Law. This Purchase Agreement shall in all respects be interpreted, construed and governed by and in accordance with the laws of the State of Florida without giving effect to any choice of law or conflict of law principles. Venue shall lie in both Miami-Dade County, Florida and Fulton County, Georgia. Both Parties waive Jurisdiction and Venue for purposes of enforcement of this Purchase Agreement.

11.9.    Counterparts.  This Purchase Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Purchase Agreement by facsimile or electronic signature PDF shall be as effective as delivery of a manually executed counterpart of this Purchase Agreement.

11.10.    Interpretation.  The Parties hereto have participated jointly in the negotiation and drafting of this Purchase Agreement. Consequently, in the event that an ambiguity or question of intent or interpretation arises, this Purchase Agreement will be construed as if drafted jointly by the Parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Purchase Agreement.

11.11.    Notices.  All notices, consents, demands, requests, approvals, or other communications that are required or may be given hereunder shall be in writing and shall be deemed to have been duly given and delivered: (a) upon receipt, if personally delivered; (b) two (2) business days after deposit with a nationally recognized overnight courier service, charges prepaid, specifying next day delivery, with verification of receipt; (c) upon the date of receipt or refusal to accept delivery, as indicated on the return receipt, if sent by United States Mail, certified or registered, postage prepaid; or (d) when sent by confirmed electronic mail or facsimile (with a copy sent by regular United States mail) if sent during normal business hours of the recipient; if not, then on the next business day, addressed to the Party for whom intended at the office or email address or fax number set forth below (or at such other office or email address or fax number for a party as shall be specified by like notice); provided, however, that any notice of change of address or fax number shall be effective only upon receipt:

(a)    If to Seller:

DELERME CPA, LLC
4651 Roswell Road, B105
Atlanta, Georgia 30342

    with a copy to:

    Brian C. Near, Counsel for Seller:
    Near Law Firm
    3945 Holcomb Bridge Rd., Ste. 203
    Peachtree Corners, GA 30092

(b)    If to Principal:

Victor M. Delerme, CPA
DELERME CPA, LLC
4651 Roswell Road, B105
Atlanta, Georgia 30342

    with a copy to:

    Brian C. Near, Counsel for Principal:
    Near Law Firm
    3945 Holcomb Bridge Rd., Ste. 203
    Peachtree Corners, GA 30092

(c)    If to Purchaser or Gordon-Whyte:

GIAN GORDON-WHYTE CPA, LLC
6703 NW 7th Street, KIN 20835
Miami, Florida 33126

    with a copy to:

    Sandra York, Counsel for Purchaser and Gordon-Whyte:
    SANDRA YORK PLLC
    133 Grand Avenue, Suite A
    Coral Gables, FL 33133

10

1/20/22 4:46:04 PM

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

IN WITNESS WHEREOF, the Parties have caused this Purchase Agreement to be authorized and executed by the Parties signing below.

"PURCHASER"

GIAN GORDON-WHYTE CPA, LLC

By: _____

Gian Gordon-Whyte, Manager

Seller and Principal hereby enter into this
Purchase Agreement jointly and severally:

"SELLER"

DELERME CPA, LLC

By: _____

Victor M. Delerme-Duarte, Manager

"PRINCIPAL"

_____

Victor M. Delerme-Duarte, Individually

11

1/20/22 4:46:04 PM

43

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

**REDACTION NOTICE:**

Pages 12, 13 and 14 of the Purchase Agreement comprises Schedule A of the Purchase Agreement that 3-page schedule is a listing, by name, of each Client file that is the subject of the Transaction and  litigation.  Those 3 pages have been omitted from this filing to protect the privacy of the underlying Clients and because such listing may contain personal identifying information or data relating to such Clients, including their names and other potentially sensitive information.

44

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 |  www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

**SAMPLE EMAIL ANNOUNCEMENT**

15

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 |  www.Lehtinen-Schultz.com

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

<u>Schedule B-2</u>

**SAMPLE CLIENT INTRODUCTION**

16

1/20/22 4:46:04 PM

**LEHTINEN SCHULTZ PLLC**

**1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 |  www.Lehtinen-Schultz.com**

DocuSign Envelope ID: 8049D9C2-2E11-415C-BFD5-898DF1985D24

EXECUTION COPY

Schedule C

**SELLER POST CLOSING DELIVERABLES**

1. **EMAIL ADDRESS** and login credentials for and relating to Gian Gordon-Whyte;

2. 2021 **FEE LISTING** for professional services rendered to the Clients;

3. **CLIENT LISTING**, which listing shall include, at a minimum:

   a. Client Name;

   b. Client contact information including Client address, Client telephone numbers and Client email addresses;

   c. Federal Tax Form(s) filed; and

   d. State and Local Tax Form(s) filed

4. **CLIENT SOFTWARE DATA FILES** for each Client being Referred; CCH Software Files File

5. **CLIENT FILES**, which files should include, at a minimum:

   a. document requests;

   b. work papers;

   c. last 3 years of tax returns (or more);

   d. client notes;

   e. Client passwords and other credentials or files (QB & Tax Return Files);

6. Copy of Seller's current **ENGAGEMENT LETTER**;

7. Current **CLIENT AGREEMENTS** relating to professional services being transferred (written Client agreements and/or if Client agreements or arrangement are unwritten, descriptions of such arrangements or agreements

8. Sample of **CLIENT COMMUNICATIONS**, including communication relating to:

   a. document request(s) email

   b. opening of tax season email

   c. completing of tax return email

   d. soliciting payment emails; and

   e. all and all other routine or customary Client communication.



17

1/20/22 4:46:04 PM

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

## EXHIBIT B TP COMPLAINT

## NOTICE OF DEFAULT



133 Grand Avenue, Suite A
Coral Gables FL 33133
📞 305.229.8888
✉ sandra.york@yorkpllc.com

February 14, 2022

VIA FEDEX, OVERNIGHT MAIL
TRACKING NO. 289829954315; 289830042505

Victor M. Delerme, CPA
DELERME CPA, LLC
4651 Roswell Road, B105
Atlanta, Georgia 30342

Re:       Gordon-Whyte Purchase Transaction
          NOTICE OF DEFAULT

Dear Mr. Delerme:

Reference is made to that certain Purchase Agreement dated January 21, 2022 among GIAN GORDON-WHYTE CPA, LLC as "Purchaser," DELERME CPA, LLC, as "Seller" and VICTOR DELERME as "Principal" (the "Agreement") and all capitalized terms used herein but not defined shall have the meaning(s) set forth in the Agreement.

NOTICE IS HEREBY GIVEN to Seller and Principal of their respective failure to comply with certain material terms and obligations of the Agreement including the obligations expressed in Paragraphs 3.1, 3.2, 3.3, 3.4 and 9.2.  For example, Seller and Principal have failed to make the necessary Referrals as required by the Agreement.  As you know, the Referral is the cornerstone of the transaction. Needless to say, failing to Refer constitutes a material breach of this Agreement by Seller and Principal.  The foregoing is in addition to the fact that Seller has delivered a total of 103 files, rather than 107.[1]  And, most disturbingly are the findings of Purchaser's recent review of the taxpayer Client files.

Based on Purchaser's internal review, the review of its advisors and other Purchaser representatives who are also practiced tax professionals, there appears to be evidence of potential preparer abuse, negligence and/or recklessness.  We fear that approximately 75% of the files furnished by Seller may be the subject of proscribed conduct under I.R. C. § 7407(b)(1) and under 26 U.S.C §§ 6694 and 6695.  Specifically, there is evidence on several Forms 1040 Schedules A that seems to report personal expenses as business expenses and which potentially inflates unreimbursed employee expenses.  In other instances there appears to be inflated or unsubstantiated deductions on Form 1040 Schedule C deductions by potentially fabricated businesses and reporting losses from such business or by inflating losses from an actual business.  Also, virtually every file presented oddly includes a Management Fee deduction on Form

_____

[1] Four (4) files were duplicates

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

Victor M. Delerme, CPA
DELERME CPA, LLC
     Re:     Gordon-Whyte Purchase Transaction
              Notice of Default: Demand For Recession
February 14, 2022

1040 Schedule E and there is also a disproportionate number of amendments that were prepared to subsequently include Form 1040 Schedules C and E.  And finally, there appears to have been a failure by the preparer to conduct the due diligence needed to support the return.  Because these irregularities are repeated, continuous and occur over multiple years, we are deeply concerned.

     We believe that  this presents substantial and irreparable harm to Purchaser and, given both the gravamen and abundance of these issues, Purchaser is left with no option but to promptly rescind the transaction.  Based on the foregoing, **DEMAND IS HEREBY** made in the sum of **$112,500**.  My client has authorized me to prepare a general release for Seller and Principal upon of Purchaser's receipt of the requested funds. Please remit proceeds to:

Jamaica Money Market Brokers Ltd.
Account No 36022738
Citibank N.A., 111 Wall Street, New York, NY 10043
Swift: CITIUS33
Routing Number: 021000089
Beneficiary: Gian Gordon-Whyte
A/C: 4201161
Address: 3 Fairway Ave Townhouse #6, Kingston 10

     This letter is not intended to and does not waive any rights, powers, privileges, remedies, or defenses of Purchaser or Gordon-Whyte, now existing or hereafter arising, all of which are expressly reserved.

     **ALL RIGHTS RESERVED**.

     If you have questions regarding the above or if you wish to discuss this matter further, please do not hesitate to contact me at 305-229-8888.

Very truly yours,
SANDRA YORK PLLC


By: _____
     Sandra York

2                           2/14/22 2:09:34 PM

Victor M. Delerme, CPA
DELERME CPA, LLC
     Re:    Gordon-Whyte Purchase Transaction
             Notice of Default; Demand For Recession
February 14, 2022

Brian C. Near, Esquire
Near Law Firm
3945 Holcomb Bridge Rd., Ste. 203
Peachtree Corners, GA 30092

3                    2/14/22 2:09:34 PM

**LEHTINEN SCHULTZ PLLC**
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

## EXHIBIT C TO COMPLAINT

EXHIBIT C1 of C9

**From:** Roxanna Montes <roxanna@delermecpa.com>
**Date:** February 15, 2022 at 10:22:24 AM EST
**Subject: Tax consultation / client for Gian**

[10:20 AM] Victor Delerme

**First Name:**
**Last Name:**
**Phone Number**
**Email Address:**

needs a consultation

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

EXHIBIT C2 of C9

**From:** Roxanna Montes
**Sent:** Tuesday, February 15, 2022 11:49 AM
**To:** Gian Gordon-Whyte <gian@delermecpa.com>
**Cc:** Victor Delerme <victor@delermecpa.com>
**Subject:** RE: Tax consultation / client for Gian
**Importance:** High

Hello Gian, these are 3 more new clients for tax consultation.

[11:07 AM] Victor Delerme

**First Name:** ▮
**Last Name:** ▮
**Phone Number:** ▮
**Email Address:** ▮

**LEHTINEN SCHULTZ PLLC**
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

EXHIBIT C3 OF C9

[11:29 AM] Victor Delerme

**First Name:** ███████
**Last Name:** ███████
**Phone Number:** █████████████
**Email Address:** █████████████

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

EXHIBIT C4 OF C9

[11:46 AM] Victor Delerme

**First Name**:
**Last Name**:
**Phone Number**:
**Email Address**:

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

EXHIBIT C5 OF C9

**From:** Roxanna Montes
**Sent:** Tuesday, February 15, 2022 12:04 PM
**To:** Gian Gordon-Whyte <gian@delermecpa.com>
**Cc:** Victor Delerme <victor@delermecpa.com>
**Subject:** RE: Tax consultation / client for Gian

**New client**

**First Name:**
**Last Name:**
**Phone Number:**
**Email Address:**

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

EXHIBIT C6 of C9

**From:** Roxanna Montes <roxanna@delermecpa.com>
**Date:** February 17, 2022 at 11:02:34 AM EST
**Subject: RE:  Tax consultation /  client for Gian**


I forgot to include the phone number ███████████

███████████████████████████

Client needs accounting and tax.


Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

---

**From:** Roxanna Montes
**Sent:** Thursday, February 17, 2022 10:38 AM
**To:** Gian Gordon-Whyte <gian@delermecpa.com>
**Cc:** Victor Delerme <victor@delermecpa.com>
**Subject:** Tax consultation / client for Gian

███████████████████████

Client needs accounting and tax.

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

EXHIBIT C7 of C9

56

**From:** Gian Gordon-Whyte <gian@delermecpa.com>
**Subject: Fwd: Client referral**
**Date:** March 29, 2022 at 8:46:24 PM EDT
**To:** Sandy York <sandra.york@yorkpllc.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Roxanna Montes <roxanna@delermecpa.com>
> **Date:** February 22, 2022 at 12:20:13 PM EST
> **Subject: Client referral**

███████████████████

For taxes.

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

57

EXHIBIT C8 OF C9

**From:** Gian Gordon-Whyte <gian@delermecpa.com>
**Subject: Fwd: Client Referral**
**Date:** March 29, 2022 at 8:46:10 PM EDT
**To:** Sandy York <sandra.york@yorkpllc.com>

Sent from my iPhone

Begin forwarded message:

**From:** Roxanna Montes <roxanna@delermecpa.com>
**Date:** February 22, 2022 at 4:02:23 PM EST
**Subject: Client Referral**

**First Name:** ███████
**Last Name:** ███████
**Phone Number:** ███████████████
**Email Address:** ███████████████

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

58

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507  |  Miami, Florida 33131  |  Tel. 305 760 8544 |  Fax. 305 356 5720 |  www.Lehtinen-Schultz.com

EXHIBIT C9 OF C9

**From:** Roxanna Montes
**Sent:** Tuesday, February 22, 2022 4:00 PM
**To:** Gian Gordon-Whyte <gian@delermecpa.com>
**Subject:** Client Referral

**First Name:** ▮▮▮▮▮
**Last Name:** ▮▮▮▮▮
**Phone Number:** ▮▮▮▮▮▮▮
**Email Address:** ▮▮▮▮▮▮▮

Thanks,

**Roxanna Rivera**
**Operations Manager**
Delerme CPA
(470) 870-1877
roxanna@delermecpa.com

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

## EXHIBIT D TO COMPLAINT



From: **Brian Near** nearlawfirm@hotmail.com
Subject: Re: LEGAL NOTICE! NOTICE OF DEFAULT
Date: February 17, 2022 at 2:35 PM
To: Sandy York sandra.york@yorkpllc.com, **Victor Delerme** victordelerme@gmail.com
Cc: Brian Near nearlawfirm@hotmail.com

Sandy,

After speaking with you yesterday morning, I advised you that I would reach out to my client. Unfortunately, when I did, I found out Mr. Delerme is traveling now and previously had left the transition in the capable hands of his Operations Manager, Roxanna.

Obviously, your inflated claims and resolution sought cannot be addressed by her. It is beyond her level of authority. Roxanna did advise me however that Victor had instructed her on transition items and she was addressing those matters in direct communication with your client. That through the outside IT resource she had established and delivered the depository for common access to the records pertaining to the client files. Moreover, at your client's direction, established and delivered the company email address for your client, provided your client with the firm's available email and phone numbers for clients that were being reached out to directly by your client. As for the Webpage listing, she also said Victor had verbally requested she handle it, and, under that instruction, had personally requested via email to your client the bio information neeeded for the IT guy to change the webpage. However, your client never responded nor provided her with that information. This appears to be a simple miscommunication as both you and I provided the Bio to Victor but didn't realize (as neither of us work in his office) that Victor had asked his staff to handle it. This is why I deliberately try to stay out of the operations and try to let clients communicate directly. We put it together, they implement. The Webpage Bio could have been, and still can be, remedied had your client or her staff simply responded to the request directly.

I am honestly distressed that you and your client were in such a rush and never did any due diligence in reviewing the accounts purchased. Drafting was deliberately changed to at least give you assurance that bad (such as duplicates) and unreachable accounts would be credited off and real, established clients would be delivered. I don't believe you're alleging you got any fake or non-existent accounts, rather, after looking at them, your client simply just isn't satisfied with certain past practices related to what she purchased. Returns of this sort were never considered nor provided for as a Costco style return was never intended to be an option. To quell your initial questions, I, like Roxanna, asked (however you this time) for specific trouble files to review and identification of its actual preparer. You likewise have not provided me with anything to review or discuss with my client in this regard.

With brokerage and legal fees spent, only Victor can really address how to respond to your actual demand. Whether he's willing to repurchase the client accounts is up for his determination, but I don't see any basis for recission; only perhaps credit on a few files which will be reviewed in good faith. Regardless, upon Victor's return, I will discuss the matter with my client and get back to you as soon as possible. Meanwhile, I am gravely concerned about fruit rotting on the vine. Advise your client accordingly.

Sincerely,

Brian C. Near, Attorney

**NEAR LAW FIRM**
3945 Holcomb Bridge Rd., Ste. 203
Peachtree Corners, GA 30092
**(770) 242-0850 Ph.**
**(404) 996-1354 Fax**
nearlawfirm@hotmail.com
www.nearlawfirm.com
www.facebook.com/NearLawFirm

LEHTINEN SCHULTZ PLLC
1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

## EXHIBIT E TO COMPLAINT



**NEAR LAW FIRM**
3945 Holcomb Bridge Rd., Ste. 203
Peachtree Corners, GA 30092
Email: nearlawfirm@hotmail.com
Phone 770-242-0850
Fax: 404-996-1354

VIA Email: sandra.york@yorkpllc.com

Sandra York, Esq.
133 Grand Ave., Suite A
Coral Gables, FL 33133

Re:     Gordon-Whyte Purchase Transaction
        NOTICE OF DEFAULT / DEMAND FOR PAYMENT

Dear Sandra:

It was a pleasure speaking with you regarding the Gordon-Whyte Purchase transaction and your demand of February 14, 2022. Although we've discussed this, for the record, I must reiterate my client's (as "Seller") position and your confirmation that your client ("Purchaser") is rejecting the servicing of accounts purchased. Moreover, this is to notify you that until resolved, Seller has no choice but to mitigate his breach of contract damages by servicing those who require service.

Formally, my client denies your stated assertions and instead we interpret your client's actions as an anticipatory breach of the agreement entitling the Seller to an acceleration of the outstanding Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) due under the agreement between the parties ("Agreement").

The fundamental stated purpose of the contract was fulfilled. Seller delivered active, tax filer accounts as expected in the Agreement. Your assertions regarding the Referral process are misguided, in that activity is both non-material and the Purchaser actively participated, endorsed, and ratified a jointly modified client contact process (otherwise known as "Referral") with the Seller's appointed agent, Roxanna. The appointment of Roxanna was explicitly to support cooperation of the Seller. In reliance on that change, I understand specific communications and direct contact information was provided promptly to Purchaser for her immediate contact with clients which she undertook. Seller in no way hindered or delayed any contact with any assigned client. Furthermore, I'm advised some of Roxanna's written requests for publication were ignored or not responded to. Seller was at all times ready, willing, and able to support Purchaser, but it also required Purchaser's cooperation and involvement with Roxanna.

As a part of the Agreement, Seller has relied to his detriment upon it and provided Purchaser with approximately 10 additional client leads. Each lead having a potential value to the parties between $1,000.00 to $1,5000 if properly serviced. Seller demands to know disclosure of those leads that have been serviced and others discarded or rejected. If those leads are or have been outright disregarded, we would like to know why as they are not a part of the pool of purchased accounts. Efforts to send additional referrals will be suspended until further notice.

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com

As for suggested irregularities found in various client accounts. The Seller's principal, Victor Delerme, did not prepare those 1040 returns and it is not the focus of his individual practice. To say some rogue, subordinate preparer might have been lazy and acted inappropriately is, for certain, without knowledge or approval. To get out of the 1040 business to a large degree is specifically why Seller sold the accounts. As you say in our discussions that errors were immediately found, I think it a dereliction on Purchaser's part not to have done any due diligence. When coupled with the push by the Purchaser for expediency in getting to a closing, Seller is sympathetic but not accountable for any breach.

Based on the foregoing, Seller's DEMAND IS HEREBY made for the outstanding $37,500.00 due under the Agreement. My client has authorized me to adjust the amount based on any duplicate accounts and any mitigation revenues received up to the $37,500.00 cap provided in Paragraph 4.1.3. In the interim, please remit proceeds as provided in the Agreement; any credit due will be promptly refunded.

This letter is not intended to and does not waive any rights, powers, privileges, remedies, or defenses of Seller or Victor Delerme, now existing or hereafter arising, all of which are expressly reserved.

**ALL RIGHST RESERVED.**

If you have questions regarding the above or if you wish to discuss this mater further, please don not hesitate to contact me at 770-242-0850.

Sincerely,

    /s/**Brian C. Near**

Brian C. Near

cc:    Victor Delerme, CPA
       Delerme CPA, LLC

LEHTINEN SCHULTZ PLLC

1200 Brickell Avenue | Suite 507 | Miami, Florida 33131 | Tel. 305 760 8544 | Fax. 305 356 5720 | www.Lehtinen-Schultz.com